In re Matilene S. **BERRYMAN,**
Respondent.

**A Member of the Bar of the District
of Columbia Court of Appeals.**

No. 99–BG–1499.

District of Columbia Court of Appeals.

Argued Dec. 1, 2000.
Decided Dec. 28, 2000.

Matilene S. Berryman, respondent pro
se.

Wallace E. Shipp, Jr., Deputy Bar Counsel, with whom Joyce E. Peters, Bar Counsel, was on the brief, for the Office of Bar Counsel.

Before SCHWELB, FARRELL and REID, Associate Judges.

REID, Associate Judge:

Contrary to the views of its hearing committee, the Board on Professional Responsibility has recommended that Matilene Berryman, Esq. be disbarred for intentional misappropriation of client funds, dishonesty, and other violations of the District of Columbia Rules of Professional Conduct. In light of our decision in *In re Addams*, 579 A.2d 190 (D.C.1990) (en banc), and subsequent cases which recognize that although the sanction of disbarment is harsh, it is nonetheless necessary to ensure public confidence in the integrity of the Bar; we adopt the Board's recommendation and order that Ms. Berryman be disbarred.

## FACTUAL SUMMARY

The record before us shows that Ms. Berryman was admitted to the District of Columbia Bar on January 10, 1975.[1] She practiced law part-time from 1975 to 1983, when she began practicing full-time as a solo practitioner. Her specialty was probate law, but she also handled some personal injury cases.

Bar Counsel's specification of charges against Ms. Berryman, signed on May 23, 1997, related to her handling of the affairs of Mary Patterson. Prior to rendering services to Ms. Patterson, Ms. Berryman was retained by Edward A. Patterson, the man with whom Mary Patterson resided and to whom Ms. Berryman believed she was lawfully married when Mr. Patterson died. Ms. Berryman handled the probate of Mr. Patterson's estate after his death. Subsequently, when Ms. Patterson suffered an arm injury during apparently negligent dialysis treatment, she prevailed upon Ms. Berryman to take legal action in her behalf, with respect to her injury, for a legal fee of $30,000. Ultimately, Ms. Berryman was successful in persuading the hospital to cancel Ms. Patterson's $499,000 debt to the hospital.

Instead of paying Ms. Berryman's $30,000 legal fee directly to her, Ms. Patterson asked Ms. Berryman to open a joint account with her at Citizens Bank and to permit her to personally use the $32,400, which she would deposit into the account. Ms. Berryman agreed because Ms. Patterson was experiencing cash flow difficulties at the time.[2] Since Ms. Patterson used some of the funds in the joint account for her personal use, the account eventually lacked funds sufficient to cover all of Ms. Berryman's $30,000 legal fee, and at the time of Ms. Patterson's death on May 31, 1993, Ms. Berryman estimated that she

[1]. Ms. Berryman holds a Bachelor of Math degree from American University and a masters degree in marine affairs from the University of Rhode Island. She taught oceanography, environmental science, and marine science at the Naval Oceanographic Office and the University of the District of Columbia. She completed her law degree at Howard University School of Law.

[2]. During the probate of Ms. Patterson's will, the Honorable Cheryl M. Long made factual findings and conclusions regarding the $30,000 legal fee and the joint bank account:
The $30,000 was made available to [Ms.] Berryman by a deposit into a bank account. The account was opened in the names of both [Ms.] Berryman and [Ms.] Patterson. [Ms.] Berryman made withdrawals both for her own needs (in effect spending part of her retainer) and for certain needs of Ms. Patterson as well. [Ms.] Patterson told [Ms.] Berryman that she wanted to maintain access to this account temporarily, so that [Ms.] Berryman could easily obtain cash for her and for other reasons. [Ms.] Patterson agreed to replenish whatever monies were withdrawn from this account for her benefit. This was their arrangement. Judge Long concluded "that this bank account was a joint tenancy with a right of survivorship in Matilene Berryman."

was still owed approximately $6,000 of her legal fee.[3]

Bar Counsel's charges that Ms. Berryman violated Rules 1.15(a) and 1.15(c) of the District's Rules of Professional Conduct relate to money which Ms. Patterson still owed Ms. Berryman at the time of her death, and the manner in which Ms. Berryman sought to retrieve what was owed to her. Bar Counsel's specifications regarding these rules read as follows:

Rule 1.15(a), ... Respondent knowingly and/or recklessly (1) failed to hold property of a client and/or third persons in her possession in connection with a representation separate from her own property (commingling) and/or (2) intentionally and/or recklessly misappropriated funds belonging to a client and/or third persons;

Rule 1.15(c), ... [D]uring the course of the representation, Respondent came into possession of funds in which another person and she claimed an interest and failed to keep those funds separate from her own funds until the dispute was resolved[.]

The record before us is not crystal clear as to how the Citizens Bank joint account and Ms. Patterson's indebtedness to Ms. Berryman were handled during the period April 1993 to September 1993. In her testimony of May 1, 1998, before a hearing committee, Ms. Berryman stated that Ms. Patterson, who owned rental property, gave her an "April rent" check or money order and "wanted [Ms. Berryman] to take the May rent check." Subsequently, Ms. Patterson received two other checks, one from T. Rowe Price, and the other from Pennzoil. In addition, Ms. Berryman asserted that Ms. Patterson informed her that another check, in the amount of $7,000 would arrive in June, "and that she [Ms. Patterson] would use that to finalize the last payment that she owed to [Ms. Berryman]."

Ms. Patterson died before the rental money orders, and the T. Rowe Price and Pennzoil checks were deposited. Subsequent to Ms. Patterson's death, Ms. Berryman took a deposit slip, dated May 30, 1993, and four money orders and checks to the Citizens Bank for deposit. The deposit, which amounted to $939.84, consisted of the following:

| | |
|---|---|
| Money Order # 1, dated June 14, 1992 | $150.00 |
| Money Order # 2, dated June 14, 1992 | $500.00 |
| T. Rowe Price Check | $139.87 |
| Pennzoil Check | $149.97 |

Instead of May 30, 1993, a copy of the deposit slip revealed that the deposit was made on July 17, 1993. However, accounting records presented to the hearing committee showed a deposit date of September 3, 1993.

Ms. Berryman maintained that after she received the April rental money orders, Ms. Patterson retrieved them for her own use. Ms. Berryman attached to her amended reply brief in this case copies of money orders in the amount of (1) $150 with a handwritten notation of "April Rent 1993" and (2) $500, with the same notation.

---

**3.** Judge Long of the Probate Division made the following findings and conclusions regarding Ms. Berryman's $6,000 claim:

By the time of the decedent's death, [Ms.] Berryman claimed only to be owed the final sum of $6,000. She acknowledges that she made this payment directly to herself from this account, at some point following the decedent's demise. Eventually, [Ms.] Berryman achieved a substantial benefit for the decedent and her estate—in the form of cancellation of over $499,000 worth of hospital bills from D.C. General (footnote omitted)....

[Ms.] Berryman has indeed reported the $6,000 payment and seeks judicial ratification of this transaction. She has not sought to hide the existence of the account. To the contrary, she initially listed it as an asset of the estate on the First Account....

In retrospect, the nature of the arrangement between [Ms.] Berryman and decedent seemed to have been confidential and private between the two of them, as in a lawyer-client confidence. Thus, this Court is not surprised that there is not more corroboration of any other details. The corroboration that is provided, however, is enough to satisfy this Court that [Ms.] Berryman is not fabricating her explanation of how she came to be owed the $6,000.00.

The endorsement on the back of these money orders, executed on May 14, 1993, bears the signature, "Mary Patterson." Ms. Berryman said that she later received two money orders, one for $150, the other for $500, each bearing the handwritten notation, "May Rent 1993." [4] Initially, Ms. Berryman asserted that she used the deposit slip that she had filled out on May 30, 1993 to make the deposit, even though the actual deposit did not occur on May 30th. On cross-examination, Bar Counsel established that the April rent money orders were cashed by Ms. Patterson on May 14, 1993, and the May rent money orders were not purchased until June 14, 1993. Therefore, none of the April or May money orders were in Ms. Berryman's possession as of May 30, 1993.

Ms. Berryman testified that the difference in the July 1993 deposit date on the deposit slip, and the September deposit date reflected in the accounting records, was traceable to her action of freezing the Citizens Bank joint account after Ms. Patterson's death. Ms. Berryman indicated that some $9,000 remained in the account at the time it was frozen. Banking records for the Citizens Bank joint account show the following balances: (1) as of May 13, 1993, $14,084 .37; (2) June 11, 1993, $9,552.27; and (3) July 14, 1993, $9,275.02. On cross-examination by Bar Counsel during Ms. Berryman's May 1, 1998 testimony before the hearing committee, she stated that Ms. Patterson owed her approximately $6,000 at the time of her death, and that the balance in the Citizens Account was about $12,000 on the date of Ms. Patterson's death.

Other specification of rule violations against Ms. Berryman by Bar Counsel related to the drafting of Ms. Patterson's will by Ms. Berryman, and the appearance of Ms. Patterson's husband of record to claim his statutory share of her will:

Rule 1.8(b), . . . Respondent prepared an instrument for a client that gave her a substantial testamentary gift;

Rule 8.4(c), . . . Respondent engaged in conduct involving dishonesty, fraud, deceit, and/or misrepresentation;

Rule 8.4(d), . . . Respondent engaged in conduct prejudicial to the administration of justice.

On March 27, 1992, Ms. Patterson signed a will drafted by Ms. Berryman, who was named personal representative. The will provided for the payment of "5% of all assets" to Ms. Berryman as an expense of administration of Ms. Patterson's estate. In addition, the will specified that if Ms. Patterson's parents should predecease her, "15%" of "any legacy to them" would be distributed to Ms. Berryman.

After Ms. Patterson died, a letter of June 14, 1993, was sent to Ms. Berryman from Bonnie J. Lawless, Esq., advising her she "[had] been retained by George Thorne, husband of the late Mary Lessie Thorne Patterson," and that he was "entitled to his statutory share as the parties never divorced." The record is silent as to whether a copy of Mr. Thorne's marriage license was enclosed with the letter. Ms. Lawless sent a second letter, on June 24, 1993, complaining that all furniture and possessions had been removed from Ms. Patterson's home, even though "Mr. Thorne has a valid claim to his statutory share of the estate, including tangible personal property."

In spite of the communications from Ms. Lawless, Ms. Berryman filed a petition for probate of Ms. Patterson's estate on June 29, 1993, without naming Mr. Thorne as an interested party. On August 27, 1993, Ms. Lawless sent a letter to the Register of Wills indicating that Mr. Thorne was Ms. Patterson's husband, and attaching a copy of his marriage license, as well as a certificate from the Family Division of the Superior Court that there was no record of any

---

4. Copies of these money orders also were attached to Ms. Berryman's amended reply brief.

divorce. Mr. Thorne's notice to the Probate Division, in which he claimed a statutory share of Ms. Patterson's will as her surviving husband, was docketed on September 2, 1993. Nonetheless, on October 22, 1993, Ms. Berryman filed an inventory of Ms. Patterson's estate, and again did not list Mr. Thorne as an heir or interested party. At a hearing in the Probate Division on November 23, 1993, Ms. Berryman asserted that she did not receive written documentation of Mr. Thorne's status as Ms. Patterson's husband until September 1993, and that because Mr. Thorne had deserted Ms. Patterson for thirty years prior to her death, he was not entitled to any of her estate under D.C.Code §§ 19–103 and 19–104. Counsel for Mr. Thorne insisted that Ms. Patterson left Mr. Thorne, and that he did not desert her. Later, in 1997, this court affirmed the trial court's order concluding that Mr. Thorne was Ms. Patterson's spouse, and that he was entitled to the statutory share of her estate. *See Berryman v. Thorne,* 700 A.2d 181 (D.C.1997).

The Hearing Committee found that, "by depositing the estate funds of $939.84 into the Citizens Account, [Ms. Berryman] commingled them with her own funds," in violation of Rule 1.15(a). Furthermore, "by drawing on the Citizens Account, she misappropriated the estate funds for her own use," also in violation of Rule 1.15(a). However, the Hearing Committee concluded that Ms. Berryman engaged in negligent rather than intentional misappropriation. The Hearing Committee also found that, independent of commingling and misappropriation, Ms. Berryman violated Rule 1.15(c), "by failing to keep these disputed funds separate from her own funds."

The Board decided that although the Probate Division determined that Ms. Berryman was "entitled to the Citizens Bank Account because of survivorship rights," after she listed the value of that account in the inventory of Ms. Berryman's estate assets, "she was not entitled ... to make disbursements for her own purposes."

Rather, "[u]nder Rule 1.15(c), she was required to keep the Citizens Account separate until the rights to the account had been determined." Because the $939.84 sum "was subject to claims by heirs and creditors of the estate," Ms. Berryman also "violated Rule 1.15(c) when she deposited the ... $939.84 payable to [Ms.] Patterson in the Citizens Account and made no disclosure of that fact to the Court." Moreover, the Board also agreed that Ms. Patterson commingled and misappropriated funds, in violation of Rule 1.15(a). However, in contrast to the finding of the Hearing Committee, that Ms. Berryman's "decision to deposit the Patterson check into her own account was unintentional," and therefore negligent misappropriation, the Board found intentional misappropriation. As the Board stated, in part:

> As an experienced probate attorney, [Ms. Berryman] was well aware that the checks [and money orders made out to Ms. Patterson] were assets of the estate, subject to claims by heirs and creditors, including herself. She was also aware of her duty to preserve estate assets. By appropriating the $939.84, she effectively placed her claim above all other heirs and creditors without authorization from the Court.

> [Ms. Berryman's] explanations for her behavior also betray motives inconsistent with simple negligence. First, [she] backdated the deposit slip to make it appear that the deposit occurred prior to [Ms.] Patterson's death. This also confirms [Ms. Berryman's] understanding that, after [Ms.] Patterson's death, the checks became the property of the estate. Second, [Ms. Berryman] insisted that [Ms.] Patterson gave her the checks in May of 1993, shortly before [Ms. Patterson's] death. However, the record reveals that the [rental] money orders were not purchased until *after* [Ms.] Patterson's death, and that [Ms.] Berryman billed the estate for retrieving the Pennzoil and T. Rowe Price checks from [Ms.] Patterson's house on July 1, 1993.

Confronted with the many inconsistencies in her explanations, [Ms.] Berryman admitted that she converted the checks because [Ms.] Patterson owed her the money, and she believed she was entitled to keep it without reporting it to the Probate Court. In so doing, she eliminated any reasonable possibility of having her efforts perceived as unintentional.

With respect to the violation of Rule 8.4(c) for dishonest conduct, both the Hearing Committee and the Board found Ms. Berryman violated the rule by failing to list and notify Mr. Thorne as an interested party in the probate of Ms. Patterson's estate, because of his marriage to her. The Hearing Committee and Board disagree, however, as to whether Ms. Berryman was dishonest with regard to commingling and misappropriation. The Hearing Committee declared that the commingling and misappropriation "reflected a genuine but erroneous belief on the part of [Ms. Berryman] that she was entitled to the funds at issue." In contrast, the Board "conclud[ed] that [Ms. Berryman's] efforts to conceal her misappropriation of the deposit on July 1[7], 1993, also reflected dishonesty," because Ms. Berryman "backdated the deposit slip, prevaricated regarding her possession of the checks in May of 1993, and failed to disclose the conversion to the Probate Court."[5]

At the conclusion of its analysis, the Hearing Committee recommended a one year suspension, based on negligent misappropriation. Because of its finding of intentional misappropriation, the Board rejected the Hearing Committee's recommendation, and instead, recommended disbarment. In recommending disbarment, the Board concluded:

Under the prevailing case law, we are compelled to recommend that [Ms.] Berryman be disbarred. We do note, however, that [Ms. Berryman's] misconduct would not warrant disbarment but for the *Addams* rule and suggest, as did Associate Judges Schwelb and Ruiz [in] their concurring opinion in *Pierson*, 690 A.2d [941] at 951, that the *Addams* rule is "too inflexible" and that this case presents a situation where the objectives of the disciplinary system would be fully met by a lengthy suspension.

## ANALYSIS

Ms. Berryman challenges the findings and conclusions of the Board regarding all of the specified violations of the Rules of Professional Conduct. In essence, she maintains that rulings of the Probate Division are *res judicata* and support her contention that she has not engaged in misconduct; that Ms. Patterson owed her the balance of a $30,000 legal fee, and thus, she neither commingled nor intentionally misappropriated the sum of $939.84; and that Mr. Thorne had no interest in the Citizens Bank account; and that she achieved a substantial benefit for Ms. Patterson's estate by representing her in a personal injury action against the hospital which negligently injured her arm during dialysis treatment. She also maintains that, under this court's case law, disbarment is not an appropriate sanction on this record. The Board, through Bar Counsel, argues that the disposition by the Probate Division is not a bar to disciplinary action against Ms. Berryman; that Ms. Berryman improperly designated herself as a beneficiary of Ms. Patterson's will; that she commingled and intentionally misappropriated funds from Ms. Patterson's es-

5. With regard to the remaining specifications, both the Hearing Committee and the Board agreed that, under Rule 1.5(a), Ms. Berryman did not charge "an unreasonable fee for her legal services" in connection with the administration of Ms. Patterson's estate, and that 5% of the estate assets constituted a reasonable fee. Significantly, however, while the Hearing Committee found that Ms. Berryman's failure to serve Mr. Thorne and to inform the Probate Division of his claims or the $939.84 in estate assets, constituted conduct prejudicial to the administration of justice, in violation of Rule 8.4(d); the Board determined that this conduct was dishonest, and thus, a violation of Rule 8.4(c).

tate; that her conduct was dishonest during the probate of Ms. Patterson's will; and that by her behavior, she seriously interferred with the administration of justice. On this record, and in light of this court's precedents, Bar Counsel maintains that disbarment is appropriate.

### Standard of Review

■ "[T]he scope of our review of the Board's Report and Recommendation is limited." *In re Ray,* 675 A.2d 1381, 1385 (D.C.1996). D.C. Bar R. XI, § 9(g) states in pertinent part:

> In determining the appropriate order, the Court shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.

*See also In re Pierson,* 690 A.2d 941, 946–47 (D.C.1997). Similarly, the Board is obliged to accept the hearing committee's factual findings if those findings are supported by substantial evidence in the record, viewed as a whole. *In re Micheel,* 610 A.2d 231, 234 (D.C.1992) (citing *In re Thompson,* 583 A.2d 1006, 1008 (D.C. 1990)). However, while the Board "must defer to the 'subsidiary findings of basic facts,' which include such things as credibility determinations, made by the [Board's] fact-finding body (the hearing committee)[,] . . . . the Board owes no deference to the hearing committee's determination of 'ultimate facts,' which are really conclusions of law." *Id.* (citing *Washington Chapter of the Am. Inst. of Architects v. District of Columbia Dep't of Employ-*

*ment Servs.,* 594 A.2d 83, 87 (D.C.1991)). Thus, the Board owed no deference to the Hearing Committee's finding of negligent misappropriation. As we said in *In re Micheel:* "The 'finding' of negligence had a clear 'legal consequence': it directly affected the severity of the sanction to be imposed for concededly improper conduct. The Board therefore owed no deference to the hearing committee's conclusion that [the respondent] was merely negligent." *Id.* at 235 (footnote omitted). That we are faced with a legal question, which we review *de novo,* is clear from our decision in *In re Utley:* "[W]hether [the] underlying circumstances constitute misappropriation and whether any misappropriation resulted from more than simple negligence are questions of law concerning 'ultimate facts.'" 698 A.2d 446, 449 (D.C.1997) (citing *Micheel, supra,* 610 A.2d at 234).

### The Probate Division Ruling and Res Judicata

■ Ms. Berryman argues that rulings by the Probate Division of the trial court constituted *res judicata* because (1) even though there was an effort to remove her as Personal Representative, that effort failed; and (2) Judge Long found that the Citizens Bank Account belonged to her by right of survivorship, and that Ms. Patterson owed her $6,000 when she died. The record shows that while there was an initial effort by Mr. Thorne to remove Ms. Berryman as personal representative of Ms. Patterson's estate, he waived issues regarding her removal when Ms. Berryman recognized his status as surviving spouse.[6] Given the waiver, the Probate Division never considered the substance of Mr. Thorne's arguments. More important, however, is the fact that the Probate Divi-

---

6. In rendering her August 2, 1995 memorandum opinion and order in the case of *Thorne v. Berryman,* Admin. No. 1460–93 (Superior Court, Probate Division), Judge Long quoted from a statement by counsel for Mr. Thorne during a status hearing before the Honorable Peter H. Wolf on November 23, 1993:

> I don't think Mr. Thorne genuinely objects to Ms. Berryman serving so long as

she's willing to recognize that she has a duty to him also, which is to account for the property and to make a proper distribution. She was the decedent's attorney and is familiar with her affairs. And I don't have any genuine question as to her ability to handle this so long as his status is recognized.

sion and the Board were faced with different matters.

The Probate Division had to resolve legal issues pertaining to the probate of Ms. Patterson's will, while the Board considered questions pertaining to the conduct of an attorney in relation to client affairs. The difference is apparent from footnote 16 in Judge Long's August 2, 1995 memorandum opinion and order:

> This Court has considered the rather quirky demands of the client of Ms. Berryman. It was risky, in retrospect, for [Ms.] Berryman to conduct business in the manner that she did because it so easily appears to be a self-serving explanation for why she paid herself the $6,000. However, based upon the totality of circumstances and this Court's observation of Ms. Berryman's credibility and demeanor, this Court is satisfied that she is not attempting to deceive anyone and that she is honestly reporting what occurred during the lawyer-client relationship. In retrospect, it would have been better practice to document this unique payment scheme concretely. The poor judgment in failing to do so, however, does not prove that Ms. Berryman is attempting to enrich herself for work that she never performed or that she is attempting to reserve for herself some asset that more properly belongs to the estate. The whole episode involving the bank account only looks suspicious because [Ms.] Berryman took on the role of Personal Representative, while still being a claimant. The law, however, does not preclude those dual roles.

Judge Long's footnote does not purport to address the serious issues of professional conduct that are the subject of the disciplinary action against Ms. Berryman. Moreover, Bar Counsel was not a party to the probate proceeding involving Ms. Patterson's will, and is entitled to be heard on the issue. In short, we see no *res judicata* bar to Bar Counsel's and the Board's action against Ms. Berryman. *See In re Utley*, 698 A.2d 446, 450 (D.C.1997) (an attorney who took unapproved payments representing conservator's fees and commissions, even though later ratified by the Probate Division, "used her client's funds without authorization" in violation of the rule against misappropriation).

### Rules 1.15(a) and 1.15(c): Commingling and Misappropriation

■ Commingling is the less serious of the charged violations pertaining to Rules 1.15(a) and 1.15(c). It involves the failure to keep a client's funds separate from those of the attorney. As the Board stated: "Rule 1.15(a) requires a lawyer to 'hold property of clients or third persons that is in the lawyer's possession in connection with a representation separate from the lawyer's own property....'" As we said in *In re Hessler*, 549 A.2d 700, 702 (D.C.1988): "By mingling client funds with the attorney's own, the client's funds become more difficult to trace and are subject to the risk that they may be taken by creditors of the attorney." Furthermore, "the totally improper action of placing a client's funds in the attorney's own account .... alone puts the client's funds at risk, regardless of the adequacy of the balance." *Id.* at 701–02 (footnote omitted). Here, when Ms. Berryman placed the $939.84 that represented rental and royalty payments to Ms. Patterson in the Citizens Bank Account, she commingled her client's funds with her personal funds, and thus, violated Rule 1.15(a).

Sanctions for the single act of commingling generally have ranged from censure accompanied by a requirement for continuing legal education in professional responsibility, *see In re Millstein*, 667 A.2d 1355, 1356 (D.C.1995); *In re Ingram*, 584 A.2d 602, 603 (D.C.1991); to suspension, *see In re Ross*, 658 A.2d 209, 212 (D.C.1995) (thirty day suspension for commingling and failure to make prompt payment of settlement funds). In the case of commingling and inadvertent misappropriation or negligent misappropriation, we have imposed a

sanction of suspension. *See Hessler, supra,* 549 A.2d at 703 (six months suspension).

In Ms. Berryman's case, unlike *Hessler, supra,* we are faced with more serious charges of commingling and intentional misappropriation. Misappropriation is " 'any unauthorized use of client's funds entrusted to [a lawyer], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not [she] derives any personal gain or benefit therefrom.' " *Pierson, supra,* 690 A.2d at 947 (quoting *In re Harrison,* 461 A.2d 1034, 1036 (D.C.1983)) (other citations omitted). "Improper intent need not be shown." *In re Ray,* 675 A.2d 1381, 1386 (D.C.1996) (citing *Harrison, supra*). In this case, after Ms. Patterson's death, Ms. Berryman deposited $939.84 in the Citizens Bank Account, a joint account created by Ms. Patterson and Ms. Berryman, which as of the date of Ms. Patterson's death, belonged to Ms. Berryman because of her right of survivorship. The $939.84 consisted of money orders and checks made payable to Ms. Patterson, and thus, clearly belonged to her estate. Although Ms. Berryman claimed that the money belonged to her as part of Ms. Patterson's outstanding $6,000 indebtedness to her, Ms. Berryman received no authorization to take the funds and place them in her account. Hence, she misappropriated the funds even though the Probate Division later declared that she was entitled to the Citizens Bank Account because of the right of survivorship; and despite the fact that Ms. Patterson owed her $6,000 at the time of her death. *See Utley, supra.*

The question remains whether the misappropriation was intentional or negligent, and whether disbarment or suspension is the appropriate sanction. Our misappropriation rule "does not require scienter; rather, it is essentially a per se offense." *Harrison, supra,* 461 A.2d at 1036. In this case, the Hearing Committee and the Board disagreed as to whether Ms. Berryman engaged in negligent or intentional appropriation. The Hearing Committee concluded that Ms. Berryman "negligently backdated the deposit slip for the $939.84, making it appear that the deposit had been made prior to [Ms.] Patterson's death," and that her "actions are similar to the negligent misappropriation which occurred in *In re Chang,* D.N. 389–92 (BPR July 29, 1996); *In re Choroszej,* 624 A.2d 434 (D.C.1992); *In re Reed,* 679 A.2d 506 (D.C.1996)." The Board, which was not required to give deference to the Hearing Committee's finding of "ultimate facts," *see Micheel, supra;* disagreed, concluding that Ms. Berryman's actions fell within the ambit of *Addams, supra; In re Godfrey,* 583 A.2d 692 (D.C.1990), and *Pierson, supra,* because she: (1) "backdated the deposit slip to make it appear that the deposit occurred prior to [Ms.] Patterson's death"; (2) "insisted that [Ms.] Patterson gave her the [money orders] in May of 1993," despite the fact that the money orders were not purchased until June; and (3) maintained that she was entitled to take the $939.84, "without reporting it to the Probate Court." A determination as to whether Ms. Berryman's case falls within our precedent pertaining to negligent or intentional misappropriation requires a review of our relevant past cases.

We begin with our intentional misappropriation cases. In *Addams, supra,* the respondent attorney held funds needed to prevent foreclosure on his client's home. He removed funds from the escrow account, and consequently, the check he sent to the noteholder was returned for insufficient funds. He engaged in the action of taking funds from the escrow account on more than one occasion, and made a false accounting report to his client, which did not show the funds that he had taken. When the hearing committee and Bar Counsel questioned him about his actions, he gave conflicting explanations. 579 A.2d at 199. We concluded that the respondent "knowingly used his client's money as if it were his own...." He did so "on more

than one occasion, and ... attempt[ed] to hide his actions from his client...." In affirming the Board's finding of intentional misappropriation, we said:

> We now reaffirm that in virtually all cases of misappropriation, disbarment will be the only appropriate sanction unless it appears that the misconduct resulted from nothing more than simple negligence. While eschewing a *per se* rule, we adhere to the presumption laid down in our prior decisions and shall regard a lesser sanction as appropriate only in extraordinary circumstances.... [A]s a matter of course, the mitigating factors of the usual sort ... will suffice to overcome the presumption of disbarment only if they are especially strong and, where there are aggravating factors, they substantially outweigh any aggravating factors as well.

*Id.* at 191. During oral argument, Bar Counsel, on behalf of the Board, relied heavily on *In re Robinson,* 583 A.2d 691 (D.C.1990). There, the respondent attorney cashed and used a client settlement check. When the client made repeated demands for the settlement funds, the respondent refused to honor the request, and subsequently, tendered a check for which there were insufficient funds in the account, as well as assured the client that "the bank had told him the check would be honored." *Id.* at 692. When the client protested the non-payment and threatened to report him to Bar Counsel, the respondent offered to pay the settlement funds in exchange for the client's agreement not to make a report to Bar Counsel. *Id.* We determined that the mitigating factors could not overcome the presumption of disbarment. *Id.* Among the mitigating factors were "the relatively small amount of money, the relatively short period of time during which the client was denied the misappropriated funds, the absence of financial harm to the client, the fact that the misappropriation involved a single client, the relative inexperience of respondent, the absence of a prior disciplinary record, and the character testimony of-

fered on respondent's behalf." *Id.* We concluded that the aggravating factor of "knowing dishonesty" would not have overcome an "[e]ven ... stronger showing of mitigating factors...."

The respondent in *Micheel, supra,* received rather substantial client funds related to the purchase of a residential property. The funds were placed in the attorney's regular office checking account, instead of a separate account. After paying the seller and noteholder, the attorney still retained $2,639.15 earmarked for taxes and other fees. He wrote two checks for these payments, but both were dishonored for insufficient funds. Checks written on the account, in the same period, for the attorney's business and personal expenses were not dishonored. 610 A.2d at 233. The Board rejected the hearing committee's finding of negligent misappropriation, finding instead, that the respondent's "misappropriation 'was the consequence at least of reckless handling of client funds, not mere negligence or inadvertence.'" *Id.* at 234. We agreed with the Board's determination, and held that "'[a] clear rational basis exists for [the] conclusion that attorneys who knowingly misappropriate client funds stand in a different position than attorneys who commit other acts involving dishonesty.'" *Id.* at 237 (quoting *In re Dulansey,* 606 A.2d 189, 190 (D.C.1992)).

In *In re Pels,* 653 A.2d 388 (D.C.1995), the respondent attorney used part of a $20,000 client settlement fund for personal and business-related expenses, and consequently, lacked the funds to pay the client's medical bills which amounted to $2,427. *Id.* at 390. Checks written for some of these bills were dishonored. *Id.* at 391. In his defense, the attorney maintained that he had thousands of dollars in other accounts, and thus, sufficient funds to cover the medical bills; we rejected that argument. *Id.* at 394. We concluded that the misappropriation was intentional, in part, because of the attorney's approxi-

mate year-long practice of "indiscriminate mingling of personal and client funds" and the dishonoring of the checks for medical bills; and the failure to account for remaining settlement funds. *Id.* at 395–96. We also "reject[ed] [the respondent's argument that] good faith—his reasonable but erroneous belief that he was entitled to the balance of the funds—reduced his culpability to simple negligence." *Id.* at 397.

Similar to the respondent in *Pels, supra,* the attorney in *Pierson, supra,* received client settlement funds. She used the funds to pay her law firm's operating expenses, and thus, did not tender the funds to the proper party. Because the suit had been dismissed after settlement was reached, the case had to be reinstated and a new settlement reached, which required an additional $500 payment. Ms. Pierson did not tell her client about this development; nor did she have the funds to pay the settlement to the proper party, even though she indicated that the funds were in her escrow account. Therefore, a second default took place. Subsequently, Ms. Pierson tendered a certified check to the settlement party for part of the funds, and a non-certified check for the remainder. The non-certified check was dishonored. Eventually Ms. Pierson paid the required sum. *Id.* at 943–44. We refused to accept Ms. Pierson's argument that her misappropriation was inadvertent, and that "when coupled with her past history of *pro bono* work, the absence of a prior disciplinary record, and her forthrightness with the Board and the hearing committee should be sufficient to mitigate the penalty [of disbarment]." *Id.* at 949–50. We also declared that these factors did not amount to "extraordinary circumstances" under *Addams, supra. Id.* at 950.

The respondent in *Utley, supra,* took unauthorized fees and commissions from an estate account. For example, on one occasion she took $1,223.42, and inadvertently made a duplicate payment of the same sum to herself; on another occasion, she took $5,000. *Id.* at 448. We determined that Ms. Utley's misappropriation was intentional, first, because "her prolonged failure to repay the duplicate fee [was] tantamount to recklessness." *Id.* at 450. She refused to repay the duplicate sum despite repeated requests from the Probate Division. Second, Ms. Utley's misappropriation was deemed intentional because "each of [her] three preapproval payments to herself was a deliberate act," and the third payment was made to herself despite the Probate Division's requests to return the prior payments. *Id.*

Next, we turn to the pertinent negligent misappropriation cases which were decided after *Addams, supra,* and resulted in a sanction of suspension, instead of disbarment. The respondent in *Choroszej, supra,* represented a taxi driver in a claim for personal injuries. He received two settlement checks in connection with that representation, which he placed in his client trust account. A doctor who had treated the client had to be paid out of the settlement funds. The Board found that the respondent "genuinely believed that he had paid [the doctor] …", *id.* at 435, but had not. The respondent called the doctor's office to ask about the bill. Although he was informed that the doctor's office would get back to him, the "[r]espondent heard nothing further from the doctor's office, and respondent continued to hold an honest, but erroneous belief, that the doctor had been paid." *Id.* at 436. Thus, the attorney erroneously thought that the remainder of the funds in his client trust fund represented legal fees, and used those funds to pay business and personal expenses. After moving to Boston, the respondent learned that in fact the doctor's bill had not been paid, and subsequently, paid the $840 medical bill. *Id.* The Board concluded that the respondent's conduct was inadvertent and negligent. *Id.*

In *Ray, supra,* the respondent, who had never before probated an estate, assisted the client in the probate of an estate. *Id.* at 1383. In connection with that assis-

tance, the respondent received a check for $20,763.70 resulting from the sale of stock. The check was made payable to the estate of the decedent. The respondent deposited the check into his escrow account, and sent a check in the amount of $18,263.00 to the client. He paid estate expenses and taxes, in the amount of $223.85, out of part of the remaining $2,500.70, and kept the rest for himself as his legal fee, without a court order. He maintained that he was unaware of the need for a court order before he could take his legal fee. *Id.* at 1384. The Hearing Committee found no " 'clear and convincing evidence that [the respondent] deliberately or recklessly attempted to deprive the estate of its funds.' " *Id.* at 1387. The Board also determined that the respondent's "conduct 'did not reach the level of recklessness, but that his misappropriation stemmed from no more than simple negligence.' " *Id.* at 1388.

The respondent in *Reed, supra,* also was inexperienced in the area in which the professional rules violation occurred. At the time the respondent agreed to handle her first personal injury case for a friend, the respondent had been in practice for less than two years and had specialized in criminal defense work. *Id.* at 507. The respondent's representation resulted in a settlement of $3,600, one-third of which represented her legal fee. After the respondent sent a check to the client, representing her share of the settlement, she had sufficient funds to pay two doctor's bills. However, one of the bills, for $435, was not paid. Believing she had paid the doctor's bill, the respondent used the remaining funds for other purposes, unrelated to her representation of the client. When the respondent discovered that there was no record of payment of the medical bill, she mailed a check to the doctor's attorney. *Id.* at 508. The Board found that the failure to pay the doctor was inadvertent, and Bar Counsel filed no exception to this finding. *Id.*

In *Chang, supra,* 694 A.2d 877 (D.C. 1997), the respondent handled a real estate purchase transaction for his brother. In connection with that transaction he received $890,000 which he placed in his escrow account. Although, in addition to the purchase price of the property in question, the respondent had to pay property taxes, he had not obtained the tax money from his brother, but thought that there were sufficient funds in his escrow account to cover the taxes, which amounted to $8,013.77. The respondent left town for a family vacation and was unaware that two checks written on his escrow account, one for $1,000, the other for $2,000 had been dishonored because of insufficient funds. *Id.* at 879. Upon his return, he corrected the problem and made the payments that had been dishonored. *Id.* at 880. The Hearing Committee credited the respondent's explanation and Bar Counsel found it " 'entirely credible.' " *Id.* at 879. Consequently, the Board recommended that the respondent be disciplined for negligent, rather than intentional misappropriation.

*In re Haar,* 698 A.2d 412 (D.C.1997) involved a dispute between the respondent and his client regarding his legal fee for representation in an employee termination matter. The respondent demanded $12,921.75, and the client offered to settle for $4,000. *Id.* at 414. The attorney maintained that he agreed to accept $10,161.75. *Id.* Three settlement checks were received from the employer, two made payable to both the client and the respondent, and one only to the client. *Id.* The respondent paid the funds to the client which were represented by the check paid solely to her, and placed the joint checks in an escrow account. He then advised the client that he would take the $4,000 undisputed part of his legal fee. *Id.* at 414. He also advised the client that he planned to take the remainder of the fee which he claimed, but the client responded by requesting that he replace the $4,000 which he had withdrawn from the trust account. *Id.* at 415. The respondent

refused to do so, and eventually obtained a default judgment against the client in the amount of $12,921.75. *Id.* We determined that:

> [The respondent] mistakenly perceived no dispute whatsoever over his right to the $4,000 because he mistakenly understood the law to accord him at least that much since it had been offered in settlement. We therefore have here a special form of misappropriation case based on a lawyer's good faith, negligent mistake of established law and on his good faith, negligent failure to address a controlling question of fact.

*Id.* at 422. Neither Bar Counsel, nor the Board maintained that the facts of this case evidenced intentional misappropriation.

In another negligent misappropriation case, also decided today, *In re Travers,* 764 A.2d 242 (D.C.2000), the respondent took a $3,000 legal fee before the filing of a petition for probate, with the concurrence and signature of the personal representative named in the will, as well as with the consent of the heirs of the estate, but without the approval of the Probate Division. He also accepted a $652.74 fee for the sale of a property asset of the estate, with the consent of the heirs, but without the approval of the Probate Division. Subsequently, he was ordered to repay the estate the sum of $3,652.74, but failed to do so despite demands from the successor personal representative of the estate. The Hearing Committee concluded, in part, that he violated former DR 2–106(A) by agreeing to, charging and collecting an illegal fee; and that under *Ray, supra,* he misappropriated funds, in violation of former DR 9–103(A) and Rule 1.15(a). In concluding that respondent engaged in negligent misappropriation, the Hearing Committee stated: "Respondent has convinced the Committee that initially he sincerely believed the requirement [to obtain court approval of his legal fee] was not applicable to him under the circumstances." Furthermore, the Committee

found no recklessness or intent to conceal: "Respondent's actions in obtaining the consents of the heirs and filing those consents with the Court, we believe support a finding that he was not reckless and that he was no way trying to mislead or conceal his conduct." The Hearing Committee also determined that respondent's failure to pay the judgment against him seriously interfered with the administration of justice under Rule 8.4(d). However, the Committee concluded that he did not engage in conduct prejudicial to the administration of justice, under former DR 1–102(A)(5), when he failed to seek approval of the Probate Division before he took his legal fee, stating: "if anything [respondent has been] over zealous in engaging in a dialogue with the courts regarding this issue." This court accepted the Hearing Committee's findings.

Ms. Berryman's situation does not fall neatly into any of the intentional and negligent misappropriation cases discussed above. Unlike the various intentional misappropriation cases, Ms. Berryman did not misappropriate client funds on more than one occasion nor engage in protracted mishandling of estate funds, nor present checks which were dishonored for insufficient funds. However, unlike the different negligent misappropriation cases, there was no finding by Bar Counsel or the Board that Ms. Berryman's misappropriation was traceable to an "honest, but erroneous belief"; Ms. Berryman specialized in probate matters; and backdated a deposit slip. Thus, Ms. Berryman is not in the same posture as the respondents in *Ray* and *Reed, supra,* who had not handled a probate matter prior to their misappropriation. Nor can she rely on the lack of evidence of intentional misappropriation, that is, the absence of any backdated document, as in *Travers* or *Haar, supra,* or any honest but erroneous belief, as in *Choroszej, supra,* that client funds had been properly used for a client matter. Nor, as in *Travers, supra,* can she assert that she took the $939.84 with the consent of the

heirs, or with the concurrence of a third party.

What draws Ms. Berryman closer to the intentional misappropriation cases are two factors. First, the absence of a prior disciplinary record in Ms. Berryman's case, even when coupled with other mitigating factors, is not a sufficient to overcome the presumption of disbarment. The respondent in *Pierson, supra,* not only was relatively inexperienced, but also had a clean disciplinary record prior to writing checks for client matters that were dishonored. In fact, Ms. Pierson's "past history of *pro bono* work, the absence of a prior disciplinary record, and her forthrightness with the Board and hearing committee," *id.* at 950, were insufficient to "substantially outweigh the aggravating factor of dishonesty." *Id.* As we reiterated in that case:

> Given the holding of *Addams,* the mitigating factors in this case—the relatively small amount of money, the relatively short period of time during which the client was denied the misappropriated funds, the absence of financial harm to the client, the fact that the misappropriation involved a single client, the relative inexperience of respondent, the absence of a prior disciplinary record, and the character testimony offered on respondent's behalf—are insufficient to overcome the presumption of disbarment.... Even with a stronger showing of mitigating factors, the aggravating factors found by the Board, including the incident[ ] of knowing dishonesty ... make clear his failure to overcome the presumption.

*Id.* (quoting *In re Robinson,* 583 A.2d 691, 692 (D.C.1990)). Second, the Board's finding of Ms. Berryman's dishonesty and interference with the administration of justice, in violation of Rules 8.4(c) and 8.4(d), is indisputable, and separates her case, in large measure, from that of the respondent in *Travers, supra.* Unlike the respondent in *Travers* who sought the consent of the personal representative and the heirs before acting, Ms. Berryman refused to list Mr. Thorne as an interested party in Ms. Patterson's estate, or to include him in her service certifications to all parties in Ms. Patterson's probate matter, even though Mr. Thorne's attorney advised her that he was Ms. Patterson's lawful husband at the time of Ms. Patterson's death. Although she may well have been stunned and skeptical when Mr. Thorne resurfaced after an apparent absence of some thirty years from Ms. Patterson's life and refused to believe his status until presented with proof, nonetheless as an officer of the court, she had an obligation to list him as an interested party upon receiving the communications from his attorney. In addition, contrary to Ms. Berryman's initial explanation that she had the rental money orders in hand on May 30, 1993, prior to Ms. Patterson's death, the record is clear that she could not have received the money orders until June 14, 1993, when they were purchased. Furthermore, despite being an experienced probate attorney, and knowing that the rental money orders, the T. Rowe Price and the Pennzoil checks, all totaling $939.84, were made payable to Ms. Patterson, and thus, were presumptively part of Ms. Patterson's estate, nonetheless Ms. Berryman took these funds for herself, without court approval, and, unlike the respondent in *Travers, supra,* who made no attempt to conceal his actions, backdated the July 17, 1993 deposit slip, so that it appeared that the money orders and checks were received as of May 30, 1993, before Ms. Patterson's death. Although Ms. Berryman may have held a steadfast belief that the $939.84 belonged to her as part of Ms. Patterson's indebtedness to her, she should have recognized her obligation, as Personal Representative of Ms. Patterson's estate, to account for those funds, to list herself as a creditor of Ms. Patterson's estate, and to permit the court to resolve her claim. Instead, she placed herself ahead of all other creditors, without the approval of the Probate Division.

Accordingly, we are constrained to agree with the Board that Ms. Berryman engaged in intentional misappropriation, and that the appropriate sanction is disbarment. Obviously, disbarment may appear to be quite harsh in this case where Ms. Berryman previously enjoyed a twenty-four year career as an attorney without a single blemish, rendered extraordinary service to Ms. Patterson, even to the point of depositing her $30,000 legal fee, for persuading D.C. General Hospital to cancel Ms. Patterson's $499,000 indebtedness, in a joint account so that Ms. Patterson might use the funds to ease her own apparent cash flow problem, and took the $939.84 as part of Ms. Patterson's indebtedness to her. Nevertheless, we have stated previously that harshness does not overcome the presumption of disbarment:

> We recognize that "disbarment in a case such as this may seem to be a harsh sanction when compared with sanctions for other violations involving arguably more egregious conduct." *In re Micheel, supra,* 610 A.2d at 236 (citations omitted). However, we are equally mindful that, "where client funds are involved, a more stringent rule is appropriate" to ensure that "there not be an erosion of public confidence in the integrity of the bar." *In re Addams, supra,* 579 A.2d at 197–198.

*Pierson, supra,* 690 A.2d at 949.

It is therefore **ORDERED** that respondent, Matilene S. Berryman, is disbarred from the practice of law in the District of Columbia, effective thirty days from the date of this opinion. *See* D.C. Bar R. XI, § 14(f). For the purpose of seeking reinstatement to the Bar, the period of disbarment shall not be deemed to begin until respondent files a sufficient affidavit pursuant to D.C. Bar R. XI, § 14(g). *See* D.C. Bar R. XI, § 16(c).

FARRELL, Associate Judge, concurring:

I join entirely Judge Reid's opinion for the court, but do not wish to be read as endorsing the current Board's view that the *Addams* rule is too inflexible and should be reconsidered.