*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-BG-674

IN RE EVAN J. KRAME, RESPONDENT.

A Member of the Bar of the District of Columbia Court of Appeals
(Bar Registration No. 370772)

On Report and Recommendation of the
Board on Professional Responsibility
(Bar Docket Nos. 2007-D040 & 2012-D449)
(Board Docket No. 16-BD-14)

(Argued June 24, 2021                    Decided November 3, 2022)

*Andrew H. Marks* for respondent.

*Becky Neal*, Senior Assistant Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, was on the brief, for the Office of Disciplinary Counsel.

*Stephen H. Marcus* filed an amicus curiae brief on behalf of respondent's clients, David Abramowitz, David Farber, Debra Friedmann, Peter Friedmann, Alan Golden, Neil Kishter, James A. Klein, Laurence Kline, Paul Rosengard, Steven Solomon, Jeffrey O. Spiegel, Ellen B. Kagan Waghelstein, Charles Weinberg, and Rabbi Shohama Wiener, in support of respondent.

*Rachel F. Cotton* filed an amicus curiae brief on behalf of District of Columbia Bar members Barry Coburn, Sherman L. Cohn, Anne W. Coventry, Myrna L. Fawcett, Leslie G. Fein, Steven W. Jacobson, Alban Salaman, Raymond J. Sherbill, Frederick J. Tansill, and Stefan F. Tucker, in support of respondent.

Before MCLEESE and DEAHL, *Associate Judges*, and THOMPSON,[*] *Senior Judge*.

DEAHL, *Associate Judge*:    The Board on Professional Responsibility recommends we disbar Evan J. Krame based on his conduct as trustee of three special needs trusts.  That recommendation stems from two central conclusions.

First is the Board's conclusion that Krame "engaged in a pervasive dishonest scheme for personal gain" by knowingly making false statements to the Probate Division of the D.C. Superior Court when seeking compensation for administering the trusts.  Krame's alleged scheme related to his persistent efforts to be compensated based on a percentage of the trust funds he administered, with Krame sometimes resorting to dishonesty to evade court orders directing that he instead be compensated on an hourly basis.

Second is the Board's conclusion that, on two separate occasions, Krame misappropriated entrusted client funds when he issued duplicate payments to himself (from the trusts) for the same services.  While Krame maintained that those double payments resulted from the administrative oversights of his staff, and not any

---

[*] Senior Judge Thompson was an Associate Judge of the court at the time of argument.  She began her service as a Senior Judge on February 18, 2022.

wrongdoing on his part, the Board found that Krame himself acted negligently with respect to those duplicate payments. Disciplinary Counsel goes one step further and now contends that a "culpable state of mind is *not* an element of misappropriation," which it deems "essentially a per se offense," (quoting *In re* Cloud, 939 A.2d 653, 660 (D.C. 2007)), so that "*[a]ny* unauthorized use of entrusted funds is misappropriation."

Krame takes exception to the Board's recommendation, as does Disciplinary Counsel to a more limited extent. *See infra* Part III.E (addressing the lone exception taken by Disciplinary Counsel). Krame contends the Board usurped the Hearing Committee's role as factfinder when it repeatedly rejected the Hearing Committee's factual findings. For instance, while the Hearing Committee credited Krame's testimony that he was not deliberately or intentionally dishonest with the probate court in relation to the trusts he administered, the Board reached the opposite conclusion. Krame contends the Board thereby improperly intruded into the Hearing Committee's exclusive role as factfinder. Krame also argues that Disciplinary Counsel did not present clear and convincing evidence that he negligently misappropriated funds because it failed to show his conduct fell below a standard of reasonable care when he caused (and later corrected) the duplicate payments described above. He disputes Disciplinary Counsel's contention that

misappropriation is a per se offense that requires no finding of a culpable mindset. Rather than disbar him, Krame asks that we impose a thirty- to sixty-day suspension.

We partly agree with Krame's contentions that the Board improperly intruded into the Hearing Committee's role as factfinder. Namely, the Board failed to accept certain credibility findings made by the Hearing Committee, and some of the more serious violations found by the Board were infected by that misstep. As for the negligent misappropriation charges, we agree with the Board that Krame engaged in negligent misappropriation in at least one instance, and therefore do not need to resolve the parties' disagreement about the extent to which misappropriation is a per se offense that can be found in the absence of a culpable mindset. Ultimately, based on the type and number of Rule violations we sustain, we consider the Board's recommended sanction of disbarment to be too harsh. We instead suspend Krame from the practice of law in the District of Columbia for eighteen months.

**I.**

Not long after Krame joined the District of Columbia Bar in 1983, he developed an expertise in administering special needs trusts.[1] He preferred to be compensated based on a flat percentage of trust assets, typically 1%, determined annually. While that was once a fairly standard compensation scheme, by 2005, much to Krame's chagrin, judges in the Probate Division of the D.C. Superior Court indicated that he and other trustees should instead be paid on an hourly basis. Krame resisted that change in various ways, which eventually drew the attention of Disciplinary Counsel and prompted an investigation into his handling of three special needs trusts. The trusts at issue were for the benefit of severely disabled minors: Vernice Seay (Seay trust), De'Shawn Mecco Brown (Brown trust), and Dion Baker (Baker trust).

At the conclusion of its investigation, Disciplinary Counsel charged Krame with violating seven Rules of Professional Conduct, most of them several times over.

---

[1] Special needs trusts allow beneficiaries to "maintain their eligibility for need-based government benefits such as Medicaid and Supplemental Security Income (eligibility for which is tied to the applicant's income and assets), while at the same time preserving their own assets to provide for supplemental items or services not covered by government programs." *In re D.M.B.*, 979 A.2d 15, 16 n.1 (D.C. 2009).

They largely stemmed from Krame's efforts to continue being paid based on a percentage of trust assets, contrary to the probate court's directions, and the dishonesty he engaged in to further that pursuit. After a ten-day evidentiary hearing, the three members of the Ad Hoc Hearing Committee were ultimately divided as to which violations Krame had committed and as to what sanction should be imposed. There was some limited unanimity among the committee members, however.

The Hearing Committee unanimously found that Krame violated Rule 3.4(c)—knowingly violating an obligation to a tribunal—on two occasions. The first was when he submitted a fee petition seeking thousands of dollars in compensation for his personal crusade to be paid on a percentage basis, despite a court order directing him not to do so. And the second was when he failed to promptly return $200 in compensation following a court order to do so. The Hearing Committee also unanimously found that Krame made a false claim in an appellate brief about the non-existence of time records that could support an hours-based fee request, thereby violating Rules 3.3(a)(1) (making a false statement to a tribunal), 8.4(c) (dishonesty), and 8.4(d) (serious interference with the administration of justice). Finally, it unanimously found that Krame again violated Rules 8.4(c) and 8.4(d) when he recklessly (but not intentionally) submitted four altered time entries in support of a trustee fee petition.

A majority of the Hearing Committee then determined that the remaining Rule violation charges were not supported by clear and convincing evidence. One Hearing Committee member, however, would have found additional violations of Rules 3.3(a)(1), 3.4(c), and 8.4(c), including that the violations were made intentionally, not recklessly, and that Krame also violated Rule 1.5(a) for charging an unreasonable fee. A different Hearing Committee member would have found two violations of Rule 1.15(a) for negligent misappropriation. Because the three Hearing Committee members did not reach consensus on the charged violations, they recommended three different sanctions, ranging from a suspension of six months to eighteen months.

Both Krame and Disciplinary Counsel took exception to the Hearing Committee's report and recommendation. Disciplinary Counsel contested the Hearing Committee's determination that Krame did not commit negligent misappropriation, charge an unreasonable fee, or commit additional knowing and intentional violations of Rules 3.3(a)(1) and 8.4(c). It also argued that the Rule 8.4(c) violations that were found were intentional, not reckless. Krame, for his part, conceded the violations of Rule 8.4(c) and 8.4(d) relating to the reckless alteration of certain time entries, as well as the Rule 3.4(c) violations for disobeying a

tribunal's order. But he contested the Rule 3.3(a)(1), 8.4(c), and 8.4(d) violations relating to him making a false claim in an appellate brief.

On review, the Board largely agreed with Disciplinary Counsel. It determined that Krame negligently misappropriated entrusted client funds on two occasions when he paid himself twice for the same work in violation of Rule 1.15(a); that he charged for the time he spent litigating the fee issue in violation of Rule 3.4(c); that he committed additional and intentional (rather than reckless) violations of Rules 3.3(a)(1), 8.4(c) and 8.4(d); and that he charged an unreasonable fee in violation of Rule 1.5(a). It did, however, agree with Krame that he did not make a false statement in an appellate brief. As a sanction, the Board recommends we disbar Krame.

Krame has now filed exceptions to the Board's report and recommendation with this court. He challenges a variety of the violations found by the Board along with its recommended sanction of disbarment. Because this appeal raises a host of fact-intensive questions, we flesh out the facts more below, in the context of the particular rule violations they relate to.

**II.**

Before delving into the particular rule violations, the parties spar over an overarching question that affects much of the analysis below: Whether the Board relied upon its own de novo factual and credibility findings regarding Krame's state of mind, contrary to the factual findings of the Hearing Committee, and thereby impermissibly intruded upon the Hearing Committee's purview as factfinder. Krame asserts that the Board so intruded into the Hearing Committee's role, while Disciplinary Counsel maintains it did not do so, as the Board is free to review questions of "ultimate fact" de novo.

Two principles in this arena are clear, but in some tension. First, the Board "must accept the Hearing Committee's evidentiary findings, including credibility findings, if they are supported by substantial evidence in the record." *In re Klayman*, 228 A.3d 713, 717 (D.C. 2020) (quoting *In re Bradley*, 70 A.3d 1189, 1193 (D.C. 2013)). Second, "[t]he Board . . . owe[s] no deference to the Hearing Committee's determination of 'ultimate facts,' which are really conclusions of law and are thus reviewed de novo." *Id.* (quoting *In re Bradley*, 70 A.3d at 1194). What is less clear from our precedents is how these two principles interact. Some factual questions, like whether an individual acted with knowledge or intent, at least resemble legal

questions of "ultimate fact," so that both the Hearing Committee and the Board have a claim to being the final arbiter of such facts. To reconcile these principles, it helps to examine what our precedents mean when they speak of questions of ultimate fact.

An "ultimate fact" is a term of art that was first introduced to our Bar disciplinary jurisprudence in a case called *In re Micheel*, 610 A.2d 231 (D.C. 1992).[2] In that case, this court was confronted with the question of how much, if any, deference was owed to the Hearing Committee's finding that respondent's misappropriation was negligent as opposed to reckless. *Id.* at 234-35. Because we had never addressed that question in a Bar discipline matter, we turned to administrative case law for guidance, given the similar governing standards between this court's review of Bar discipline matters and agency actions. *Id.* at 234 & n.10. More specifically, we turned to *Washington Chapter of American Institute of Architects (AIA) v. D.C. Department of Employment Services*, 594 A.2d 83 (D.C. 1991), in which this court explained the difference between how "ultimate facts" and

---

[2] The phrase appears in just one of our prior disciplinary cases, albeit in a dissent (and only in a parenthetical quotation of another case). *In re Dwyer*, 399 A.2d 1, 15 (D.C. 1979) (Mack, J., dissenting) ("We will nevertheless give serious consideration to the findings and recommendations of the trier of fact when the determination of ultimate facts rests on the weight and credibility of witnesses who have testified in person before that committee." (cleaned up) (quoting *In re Lurie*, 546 P.2d 1126 (Ariz. 1976))).

"subsidiary findings of basic fact" are reviewed by an appellate body. *In re Micheel*, 610 A.2d at 234 (quoting *AIA*, 594 A.2d at 87). The former are facts that have a "legal consequence," which are reviewed de novo, *id.* at 235 (quoting *AIA*, 594 A.2d at 86-87), while the latter are facts "which, taken together, lead to an ultimate fact/legal conclusion," and which must be accepted by the reviewing body unless unsupported by substantial evidence. *AIA*, 594 A.2d at 87. Relying on this guidance, we concluded in *In re Micheel* that a Hearing Committee's finding of negligence was an ultimate fact that the Board owed no deference to. 610 A.2d at 235. That was because a finding of negligence, as opposed to recklessness, had a "clear 'legal consequence': it directly affected the severity of the action to be imposed." *Id.* *In re Micheel*, therefore, makes clear that the question whether a respondent possessed a certain state of mind is at least sometimes a question of ultimate fact that the Board reviews de novo.

That does not mean that a Hearing Committee's factual and credibility findings have no bearing on, or are never controlling as to, a respondent's state of mind. *In re Micheel* makes clear that neither we nor the Board can simply brush such findings aside because they affect determinations of ultimate fact. In that case, we did not ignore the Hearing Committee's findings; we accepted them and determined that, as compared to other disciplinary cases, those findings showed that

respondent's conduct was reckless rather than negligent. *Id.* at 235-37. This point was also crucial to the outcome in *AIA*, the case that informed *In re Micheel*'s analysis. *See AIA*, 594 A.2d at 87 ("[The reviewing body] did not overrule the appeals examiner's subsidiary factual findings. Rather, [it] accepted the essential facts, including credibility determinations, in the [factfinder's] ruling." (internal quotation marks and citation omitted)).

As this court has reasoned since *In re Micheel*, sometimes a Hearing Committee's factual and credibility findings preclude the Board from reaching a particular conclusion regarding an ultimate fact. That point is illustrated by *In re Temple*, 629 A.2d 1203 (D.C. 1993), decided the year after *In re Micheel*. In *In re Temple*, the ultimate fact at issue was whether respondent had been significantly rehabilitated so as to support a mere probationary sanction. *Id.* at 1208. Although we agreed with the Board that it owed no deference to the Hearing Committee's conclusion that respondent was rehabilitated given that it was an ultimate fact, we faulted the Board for supplanting the Hearing Committee's factual and credibility findings with its own when conducting its de novo review. *Id.* at 1208-09 ("The factfinder who hears the evidence and sees the witnesses is in a better position to make [credibility] determinations, having the benefit of those critical first-hand observations of the witness' demeanor or manner of testifying which are so

important to assessing credibility."). After applying the correct deference, we accepted the Hearing Committee's credibility findings as supported by "substantial evidence," and ruled that those findings compelled the conclusion that the respondent had been significantly rehabilitated. *Id.*

*In re Evans* teaches the same lesson. 578 A.2d 1141, 1142 (D.C. 1990).[3] There, the ultimate fact at issue was whether respondent had an intentional state of mind when he misappropriated client funds. *Id.* Both the Board and this court reasoned that because the Hearing Committee credited respondent's belief that he had permission to disburse the client funds that were ultimately misappropriated, respondent could not have acted intentionally. *Id.* As *In re Temple* and *In re Evans* show, although a respondent's state of mind might be an ultimate fact that is reviewed de novo, a Hearing Committee's credibility findings can still constrain the determination of ultimate fact.[4]

---

[3] *In re Evans* predates *In re Micheel* by two years, and does not speak in terms of questions of "ultimate fact," but of an "ultimate conclusion." *In re Evans*, 578 A.2d at 1149. While it is perhaps less informative than *In re Temple* because it did not grapple with *In re Micheel*'s later pronouncement that the Board does not owe deference on questions of ultimate fact, we nonetheless think it informative, if only as presaging our later analysis in *In re Temple*.

[4] *See also In re Martin*, 67 A.3d 1032, 1050-51 (D.C. 2013) (credibility finding compelled conclusion that respondent made false statements); *In re Godette*, 919 A.2d 1157, 1163-66 (D.C. 2007) (rejecting Board's finding that respondent's

With that said, as we recently observed in *In re Tun*, "in some circumstances, a Hearing Committee's finding as to a respondent's credibility 'does not warrant the normal deference.'" 195 A.3d 65, 73 (D.C. 2018) (quoting *In re Anderson*, 778 A.2d 330, 341-42 (D.C. 2001)). *In re Tun* highlighted two such scenarios. The first occurs when the Hearing Committee's findings are not supported by substantial evidence. *Id.* (citing *In re Bradley*, 70 A.3d 1189, 1194-95 (D.C. 2013) (rejecting Hearing Committee's conclusion that respondent "seemed honest" because there was "no factual support in the record" for the Hearing Committee's credibility conclusion and other evidence directly contradicted it)). The second occurs when the Hearing Committee's credibility findings are based upon a mistake of law, as opposed to the witness's demeanor or manner of testifying. *Id.* ("[T]he Hearing Committee's

---

conduct was not deliberate because the Hearing Committee's contrary finding was supported by substantial evidence and was thus owed deference); *In re Cloud*, 939 A.2d 653, 661 (D.C. 2007) (Hearing Committee credited respondent's testimony, which precluded Disciplinary Counsel from proving misappropriation was reckless); *In re Kline*, 11 A.3d 261, 264 (D.C. 2011) (Hearing Committee credited respondent's belief that the money he withdraw from a trust account belonged to him, which precluded a finding of intentional misappropriation); *In re Mba-Jones*, 993 A.2d 1071, 1073 (D.C. 2010) ("factual and credibility determinations in the Maryland proceedings" precluded a finding of intentional or reckless misappropriation); *In re Pye*, 57 A.3d 960, 973 (D.C. 2012) (adopting appended Board report) (Hearing Committee's conclusion that misappropriation "was a mistake based on its assessment of Respondent's credibility" compelled finding of negligence where Board had "no basis to question the Hearing Committee's credibility determination").

disbelief was based on an 'analysis . . . in the nature of a legal conclusion.'" (quoting *In re Anderson*, 778 A.2d at 341-42)); *see also In re Martin*, 67 A.3d 1032, 1050 (D.C. 2013) ("We do not give deference to a Hearing Committee's credibility determination where that determination is predicated upon a conclusion of law rather than the demeanor of testifying witnesses." (citing *In re Anderson*, 778 A.2d 341-42)).[5]

Our recognition of those limited bases for revisiting the Hearing Committee's credibility determinations does not affect our prior rulings that credibility findings must be accepted and can have a foreclosing impact on ultimate facts and legal conclusions, so long as they are supported by substantial evidence and uninfected by legal error. For instance, *In re Tun* accepted as settled the Hearing Committee's credibility findings where substantial evidence supported them, and rejected only those that could not be reconciled with the record evidence. 195 A.3d at 73-74

---

[5] *In re Tun* also cited *In re Romansky*, 938 A.2d 733, 739 (D.C. 2007), for the general principle established by this court in *In re Micheel*: that an ultimate fact (such as state of mind) is a legal conclusion reviewed de novo. *In re Tun*, 195 A.3d at 73. As we have already explained, that general principle does not detract from the Board's obligation to accept the Hearing Committee's factual and credibility findings that inform the Board's legal conclusions. Like *In re Micheel*, *In re Romansky* merely considered the facts found by the Hearing Committee that were supported by substantial evidence and determined whether those facts demonstrated intentionality as opposed to recklessness. 938 A.2d at 740-42.

(accepting Hearing Committee's finding that respondent made an intentionally false statement in a court filing because that finding was based on substantial evidence); *id.* at 75 (rejecting Hearing Committee's finding that respondent gave intentionally false testimony because that finding was not based on substantial evidence or respondent's demeanor in testifying).

Neither we nor the Board have carte blanche to revisit the Hearing Committee's credibility determinations simply because we disagree with them and they speak to some ultimate fact. To hold otherwise would "endanger th[e] basic allocation of decisionmaking responsibility" between the Board and the Hearing Committee. *In re Anderson*, 778 A.2d at 341. While our precedents have admittedly not always been clear on this point, we are not aware of any that conflict with the principles articulated above—stemming from *In re Micheel*, *In re Temple*, and *In re Evans*—and Disciplinary Counsel points to no genuinely conflicting authority.[6]

_____

[6] Of the cases Disciplinary Counsel relies upon, only *In re Berryman*, 764 A.2d 760 (D.C. 2000), appears to be in some superficial tension with the principles we have articulated above. That tension dissipates upon scrutiny. In *Berryman*, the Hearing Committee found respondent had negligently misappropriated funds, but both the Board and this court determined the misappropriation was in fact intentional. *Id.* at 764-65, 772-74. That would present some tension with our analysis only if the Hearing Committee's determination in *Berryman* were grounded in a credibility finding, but nothing in *Berryman* suggests that it was. Instead, it appears that the Hearing Committee, on the one hand, and the Board and this court, on the other, simply disagreed about the legal import of a set of circumstantial facts,

We therefore conclude that Disciplinary Counsel paints with too broad a brush when it asserts that Krame's "intent is an ultimate fact for the Board and Court to consider de novo," at least to the extent it suggests that review is free from the constraints of the Hearing Committee's credibility findings. It is not. Both the Board and this court must accept the Hearing Committee's credibility findings as determinations of subsidiary fact, so long as substantial evidence in the record supports them and they are not infected by any mistake of law.

## III.

We turn now to the charged Rule violations relating to Krame's administration of the Brown and Baker trusts, which is where Krame directs his argument that the Board impermissibly ignored the Hearing Committee's credibility findings related to his state of mind. Our consideration of the negligent misappropriation charges, related to the Seay trust, is addressed in Part IV of this opinion.

---

which unlike a credibility finding, is a legal question subject to de novo review. *Id.* at 772-73. In fact, *Berryman* distinguished a case finding that a misappropriation was merely negligent—*In re Chang*, 694 A.2d 877 (D.C. 1997)—on the basis that in *Chang*, "[t]he Hearing Committee credited the respondent's [exonerating] explanation and Bar Counsel found it 'entirely credible,'" *Berryman*, 766 A.2d at 771, suggesting the same was not true of the respondent in *Berryman*, and if it had been, there likely would have been a different result.

## A. False/dishonest statements to the Probate Court (Brown trust)

*Factual Background*

In 2003, the probate court approved the following compensation provision for the Brown trust:

> A Trustee shall be entitled to reasonable compensation for his or her services as Trustee hereunder, consistent with industry standards, which may be expressed as a percentage of Trust assets. ***All trustee compensation is subject to review by the Superior Court, to be approved if reasonable and modified if unreasonable. In considering the reasonableness of fees reported in the accounting by the Trustee, the Court may consider the industry practice and any other factors.***

A year later, Krame filed his first accounting reflecting the services he performed as trustee on behalf of the Brown trust during the course of that year, as well as the costs for those services. In accordance with the compensation provision above, the petition calculated Krame's fees as a percentage of the total trust assets. Krame's fees were approved by the probate court.

Krame filed his second accounting about a year later, again reflecting his services for the preceding year. As he had done with the first accounting, Krame's fees equated to 1% of the trust's assets. By that point, the probate division had

started moving away from compensating trustees on a percentage basis. Judge Peter H. Wolf, the judge assigned to the Brown trust at that time, rejected the accounting and ordered Krame to file "a thorough explanation of the 'quarterly fees' . . . so that the court [could] determine their reasonableness." Krame objected and filed a twenty-page memorandum arguing that "his fees calculated as one percent of the trust assets and paid quarterly were reasonable." He further argued that because "[a] percentage fee was agreed upon by the parties," and because "a percentage fee of one percent was previously approved by [the probate court] when it approved the first accounting," it had "not been necessary to keep detailed time records for" the Brown trust.

Judge Wolf again denied Krame's request that he receive compensation based on a 1% fee and ordered him "to file a petition for compensation . . . with full documentation of time expended and hourly rates." Krame, through counsel,[7] then filed a document entitled "Trustee's Explanation of Services," which gave an overview of the services Krame provided during the relevant time period. It did not, however, include any time records because, as Krame explained, he had "not kept time for specific services as trustee in this case." Judge Wolf interpreted that

_____

[7] Krame verified under oath that the facts provided in the "Explanation of Services" were true and correct.

statement to mean that Krame could not "provide an hourly statement of services." Without the aid of time records, Judge Wolf resigned himself to determining reasonableness based on a 1% fee, the very compensation structure he had previously rebuffed. From that starting block, Judge Wolf then approved $5,320.41 of Krame's $6,737.88 request for fees.

During its investigation, Disciplinary Counsel discovered that Krame had in fact kept time records via his billing software called PCLaw, and that those records justified time-based fees of $5,600, not the $6,737.88 Krame had sought. Believing Krame intentionally misrepresented to Judge Wolf the non-existence of his time records so that he could collect his desired 1% fee, which exceeded the amount reflected in his time records, Disciplinary Counsel charged Krame with violating Rule 3.3(a)(1) (knowingly making a false statement to a tribunal), Rule 8.4(c) (dishonesty), and Rule 8.4(d) (interference with the administration of justice).

Before the Hearing Committee, Krame testified that his limited time records were incomplete, and that those he had kept did not reflect all of the services he was seeking compensation for in the second fee petition. He also claimed that he made no misrepresentations to Judge Wolf because his statement that he had "not kept time for specific services" was "a completely truthful statement" "for *specific*

services [he] had not kept track" so it "was not an all-inclusive statement." Lastly, he testified that he did not produce his time records because he "was being an advocate for the proposition that . . . [a] percentage fee compensation was appropriate" and had he "presented time records" he would have "conced[ed] the point."

The Hearing Committee found that Disciplinary Counsel did not provide clear and convincing evidence to establish the charged violations of Rules 3.3(a)(1), 8.4(c), and 8.4(d). It credited Krame's testimony that he did not believe he made any false statements to Judge Wolf because what he said was technically true, and concluded that Disciplinary Counsel did not present any direct or circumstantial evidence to show that Krame's statements were intentionally false or inaccurate.

The Board disagreed as to the first two charged violations.[8] It first emphasized that "technically true" statements may nonetheless violate Rules 3.3(a)(1) and 8.4(c) if those statements omit material information with the intent to mislead. *See In re Shorter*, 570 A.2d 760, 768 (D.C. 1990) (dishonesty includes

---

[8] Disciplinary Counsel did not take exception to the Hearing Committee's conclusion that this charged Rule 8.4(d) violation was not supported by clear and convincing evidence, so the Board did not consider that violation, and neither do we.

suppression of the truth, not just affirmative misrepresentations); *In re Samad*, 51 A.3d 486, 499 n.8 (D.C. 2012) (Rule 3.3(a)(1) is violated where an omission of information is "the equivalent of an affirmative misrepresentation" (quoting Board Prof. Resp. R. 3.3(a)(1), cmt. 2)). Given the context in which Krame's statements were made ("the court's explicit and repeated efforts to assess the time [Krame] spent as a trustee"), as well as the reason Krame did not disclose his time records (because he did not want to compromise his 1% fee advocacy), the Board concluded that Krame's "statements were deliberately crafted to skirt the truth so as not to jeopardize his hoped-for percentage fee recovery."

*Legal Analysis*

We agree with the Board that, although Krame's statement that "he had not kept time for specific services" was true in one technical sense, Krame violated Rules 3.3(a)(1) and 8.4(c) by not divulging the time records he did have. Judge Wolf twice rejected Krame's request that he receive compensation on a percentage basis and twice requested that Krame submit detailed records to support his fee petition. When Krame failed to do so, Judge Wolf reasonably understood that Krame did not have the kind of records that would have been useful for a reasonableness inquiry. This is evident both from Judge Wolf's stated belief that Krame could not "provide

an hourly statement of services," and from Judge Wolf's lament that the "total lack of information supplied by [Krame]" meant his review of Krame's requested fees would involve an "appearance of arbitrariness." But Krame did have useful time records. In fact, his time records accounted for the vast majority of the costs reflected in the second fee petition. He simply chose not to provide them because doing so would have hurt his chances at obtaining the percentage-based fee that he wanted.

These facts are similar to the evasive conduct we reprimanded in *In re Shorter*. There, respondent drew the attention of the IRS after he failed to pay his income taxes for over a decade. 570 A.2d at 763. During the course of that investigation, IRS agents met with respondent on several occasions to inquire about his personal assets to determine what was available for the IRS to seize. *Id.* Respondent told them truthfully that he had no personal assets, but omitted that the reason for that was because all of his expenses were paid by his firm from accounts held solely in the name of his law partner. *Id.* at 763-64. He explained he did not offer that information to the agents because they never asked about anything except his personal assets. *Id.* We concluded that although respondent's answers to the IRS agents' questions were "technically true," respondent still acted dishonestly because he "knew what information the IRS was after, but for his own benefit refrained from

supplying that information even when asked questions that grazed the truth." *Id.* at 768. In other words, "[a]s long as the IRS did not ask just the right questions, respondent was prepared to deprive it of the right answers." *Id.* Krame's conduct is similar. What he informed the court may have been "technically true" on one reading, but it was sufficiently misleading for him not to disclose the time records he had. He knew those records would have aided Judge Wolf, but opted not to provide them because it would have jeopardized his chances of receiving his 1% fee. That omission amounted to a material misrepresentation in violation of Rules 3.3(a)(1) and 8.4(c).

Krame contends the Hearing Committee's factual and credibility findings precluded the Board, and prevent us, from reaching that conclusion. Not so. The only credibility finding rendered by the Hearing Committee was that it believed Krame thought he was technically telling Judge Wolf the truth about not having time records as to all of the services he rendered. But it would be a legal mistake to conclude, from that premise, that Krame did not violate Rules 3.3(a)(1) and 8.4(c) because technical truths may still violate those rules where they are intentionally misleading via omission. That credibility finding says nothing about whether Krame knowingly misled Judge Wolf by failing to notify the court that he could have produced time records as to some of the services he rendered. As for the Hearing

Committee's finding that there was "no . . . evidence" that Krame's statements were made with an intention to mislead Judge Wolf, we agree with the Board that the record is in fact replete with such evidence, so that the Hearing Committee's finding lacks substantial evidence in the record. For instance, as the Board emphasized, Judge Wolf's order—ultimately resigning to paying Krame on a percentage basis—made clear his understanding that Krame could not "provide an hourly statement of services" putting the court in a quandary due to "the total lack of information supplied by" Krame. By that point at the latest, Krame's failure to correct the court's clear misimpression that he had no hourly records cannot be chalked up to good faith, and can only be explained by Krame's deliberate and successful design to mislead the court. *See generally In re Ukwu*, 926 A.2d 1106, 1116 (D.C. 2007) ("[I]n assessing intent, the court must consider the entire context. 'A play cannot be understood on the basis of some of its scenes, but only on its entire performance.'" (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990))).

## B. False/dishonest statements to the Probate Court (Baker trust)

*Factual Background*

In March 2005, a petition was filed in probate court to establish the Baker trust, naming Krame as trustee. The compensation provision of the trust instrument

was originally the same as the one entered in the Brown trust, which allowed for compensation to be expressed "as a percentage of Trust assets." Before approving the Baker trust, Judge Franklin Burgess, Jr., the judge assigned to the matter at the time, held a two-day hearing to address the issue of trustee compensation. During the hearing, Judge Burgess said he did not want compensation "expressed as a percentage" and that it should instead be "judged on the standard of reasonableness." In light of this preference, Judge Burgess amended the compensation provision in the trust instrument to say:

> A Trustee shall be entitled to reasonable compensation for his or her services as Trustee hereunder, consistent with industry standards, not to exceed one percent (1%) of the trust corpus, determined annually. . . . **In considering the reasonableness of fees reported in the accounting by the Trustee, the Court shall consider the custom of the community; the trustee's skill, experience and facilities; the time devoted to trust duties; the amount and character of the trust property; the degree of difficulty, responsibility and risk assumed in administering the trust, including in making discretionary distributions; the nature and costs of services rendered by others; and the quality of the trustee's performance and any special skills in support of that performance**.

Krame later testified before the Hearing Committee that he understood the cap of 1% as permitting him to calculate his fees at a 1% rate rather than on an hourly basis.

A majority of the Hearing Committee credited Krame's testimony regarding his interpretation of the provision.

Over a year later, Krame filed his first fee petition for his work performed on the Baker trust. The petition requested $17,264.18 in fees, "calculated at 1% of the value of the trust." Around the same time, Krame generated a document from PCLaw that set forth the time records for the services claimed in the fee petition. That document showed a total of $12,350.59 for fees and costs—$4,913.59 less than what was requested in the fee petition. He did not attach these time records to his fee petition or at any point alert the probate court to their existence. According to Krame, the amounts were different because the time entered into PCLaw was incomplete and did not capture all of the work he did. A majority of the Hearing Committee credited this explanation.

Judge Ronald P. Wertheim, the judge overseeing the Baker trust at the time the first fee petition was submitted, denied Krame's fee request and ordered him to supply "accompanying information establishing the reasonableness of such fees." Krame filed a response to Judge Wertheim's order, stating that he "receives compensation for his services, set by agreement of the parties at one percent (1%) of the trust corpus, per year, payable quarterly." He further stated that, according to

his records, "at least 40 hours of service was" performed, for which a 1% fee was "reasonable compensation." Krame later testified before the Hearing Committee that he believed the requested fees were "appropriate compensation for" the work he was doing, and that he was "entitled to take a percentage fee" since the "language of [the] trust allowed for [that]." The Hearing Committee credited this testimony.

Judge Wertheim found that Krame acted contrary to Judge Burgess's direction, which he believed to be that "no fixed percentage was to be used as a standard or measurement of reasonableness." He then expressed frustration at the lack of documentation supporting Krame's fee request, stating that Krame provided no breakdown for the forty hours of service he claimed to have provided. With no other way to determine the reasonableness of Krame's fees, Judge Wertheim divided the total costs requested ($17,264.18) by the number of hours Krame claimed to have worked (40), which calculated to a $431.60 hourly rate; a rate that Judge Wertheim found unreasonable. Applying what he thought was a more reasonable hourly rate ($210), Judge Wertheim then approved $8,400 of the requested fees.

Disciplinary Counsel again charged Krame with violating Rules 3.3(a)(1), 8.4(c), and 8.4(d), contending that Krame (1) intentionally misled Judge Wertheim into believing he did not have useful time records and (2) misrepresented his

understanding of the trust instrument as permitting him to collect a flat 1% fee. The Hearing Committee disagreed with both points. It concluded that Disciplinary Counsel produced no evidence for its argument that Krame intentionally withheld his time records to mislead the court into granting his desired 1% fee. It then found the compensation provision of the Baker trust unclear as to whether Krame could charge a 1% fee and credited Krame's belief that he could. The Board disagreed with both of those Hearing Committee conclusions.[9] The Board found that Krame intentionally "misled Judge Wertheim into believing that [Krame] had 'scant information about his time'" when he failed to disclose his time records, and then "misrepresented to Judge Wertheim" his understanding "that his compensation had been set at 1%." We agree with the Board on the first point, but disagree with it on the second.

*Legal Analysis*

For largely the same reasons discussed *supra* in Part III.A, we agree with the Board that Krame intentionally misled the court by not disclosing his time records

---

[9] The Board did not, however, find a Rule 8.4(d) violation for this conduct, because, as with the Brown trust, *supra* note 7, Disciplinary Counsel did not take exception to the Hearing Committee's conclusion that the Rule 8.4(d) violation had not been established by clear and convincing evidence.

after Judge Wertheim expressed frustration over having no information to calculate the reasonableness of Krame's requested fees. It was clear from Judge Wertheim's orders that time records—or really any records—would have aided the court in its reasonableness analysis. Krame had those records but chose not to disclose them, not because he believed they would be of no use to the court, but per his own testimony, because he was taking a "righteous stand" and "standing up for a principle" that he was entitled to the 1% compensation he sought. The Hearing Committee made no credibility finding that we must defer to on this question; it merely concluded that Disciplinary Counsel did not present sufficient evidence to support the charge, a legal conclusion that is at odds with the record. We therefore conclude that Krame violated Rules 3.3(a)(1) and 8.4(c) by failing to disclose his time records to Judge Wertheim.

However, we cannot agree with the Board's conclusion that Krame misrepresented his understanding that the trust instrument permitted him to collect a flat 1% fee. Even if that is not a reasonable interpretation of the trust instrument, the Hearing Committee credited Krame's testimony that he nonetheless interpreted it that way. The Board was not free to reject that credibility finding—which has substantial evidentiary support (Krame's testimony) and is not premised on any legal mistake—and neither are we. The Board was obligated to accept that credibility

finding in determining whether Krame intentionally violated Rules 3.3(a)(1) and 8.4(c). It did not do that. Had it done so, it would have been precluded from determining that Krame made knowing misrepresentations to Judge Wertheim in saying his compensation for the Baker trust was "set by agreement of the parties at one percent (1%) of the trust corpus, per year, payable quarterly." Neither the Board nor Disciplinary Counsel argues the Hearing Committee's credibility finding lacked substantial support in the record, nor do they suggest it was infected by any legal mistake. It is therefore not for us, or for the Board, to second guess that credibility finding.

## C. Disobeying court orders

*Factual Background*

As the facts recounted above make clear, Krame was persistent in resisting the probate division's decision to shift from percentage-based to hours-based compensation for trustees. Krame believed his advocacy in this arena was a service to the beneficiaries of the trusts he was administering, and so he thought he was entitled to reimbursement for his time in advocating this position. Judge Wolf disagreed and ordered him not to include his litigation-related fees or costs in his fee petitions. Despite that order, Krame tried to expense litigation fees and costs to the

Brown trust on two occasions: once on November 17, 2006, when he billed the Brown trust for a $200 litigation filing fee, and again on November 22, 2006, when Krame filed a requested $8,700 worth of fees for advancing the position that he was entitled to be paid on a percentage basis. Judge Wolf disallowed both amounts. Because the $200 filing fee had already been paid out to Krame, Judge Wolf also ordered Krame to "reimburse the filing fee 'forthwith.'" Krame did not comply with that order until two and a half years later.

*Legal Analysis*

Both the Hearing Committee and the Board concluded that clear and convincing evidence existed to support the conclusion that Krame twice refused to obey a court order, each a separate violation of Rule 3.4(c). He violated the court's initial order not to include his litigation-related fees or costs in his fee petitions, and then violated its order to return the $200 "forthwith" when he failed to comply with that order for more than two and a half years. Krame concedes on appeal that he committed those violations, so we adopt the Board's conclusion that Krame violated Rule 3.4(c) in both instances.

## D. Altering time records

*Factual Background*

Krame directly appealed three orders discussed above: (1) Judge Wolf's disallowance of $1,417.47 worth of requested fees in Krame's second accounting for work performed on the Brown trust; (2) Judge Wertheim's approval of only $8,400 in fees for work on the Baker trust—a reduction from the $17,264.18 Krame requested; and (3) Judge Wolf's order prohibiting Krame from expensing litigation-related costs. *See In re D.M.B.*, 979 A.2d 15, 17-21 (D.C. 2009). Krame was unsure how those appeals would pan out, so while they were pending he did not file any fee requests for the work he performed on behalf of the Brown and Baker trusts. He did, however, start tracking his time more diligently in PCLaw in case his appeals were unsuccessful and he had to then submit time-based fee petitions. Several years later, in *In re D.M.B.*, this court affirmed each of Judge Wolf's and Judge Wertheim's orders. *Id.* at 21-26.

Following that loss, Krame filed his outstanding fee requests (covering several years) for the Brown and Baker trusts. Attached to both fee petitions was a PCLaw-generated document titled "Pre-Bill" which contained time entries for the work Krame had performed on behalf of the Brown and Baker trusts from 2006 to 2009.

Both petitions were approved by the probate court ($43,055.00 in fees for the Brown trust and $47,642.50 in fees for the Baker trust).

During its investigation, and with the aid of PCLaw's built-in audit feature (tracking changes to billing statements), Disciplinary Counsel discovered that four of the Pre-Bill time entries submitted in support of the Brown and Baker fee petitions were altered by Krame after he lost his appeal in *In re D.M.B.* The altered entries omitted any reference to work Krame performed for his litigation-related activities (which Krame was not permitted to receive compensation for per Judge Wolf's then-affirmed order), but offered alternative justifications for the same fees, totaling $860. For instance, one line item in Krame's contemporaneous time entries noted $525 for 1.5 hours of "work on notice and petition for fees," but after Krame lost his appeals, that entry was altered to the same $525 for 1.5 hours of "work ~~on notice and petition for fees~~ on accounting." Believing that and three similar alterations were a deceptive way for Krame to circumvent Judge Wolf's order and obtain compensation for his litigation fees, Disciplinary Counsel charged Krame with violations of Rules 3.3(a)(1) ("Making a false statement of fact or law to a tribunal"); 8.4(c) ("Engag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation"); 8.4(d) ("Engag[ing] in conduct that seriously interferes with the administration or justice"); and 1.5(a) (charging an unreasonable fee). Krame testified that, for each

of the four alterations, he reviewed his files and determined that he had performed equivalent compensable work that he had previously failed to record, and simply substituted that work for the now-omitted amounts for litigation fees.

The Hearing Committee "credited [Krame's] testimony regarding [his] preparation of the [time entries]." But because it recognized the "unlikelihood" and "implausibility" of Krame's ability to reliably remember work he performed years after the fact, it concluded that he recklessly (but not intentionally) violated Rules 8.4(c) and (d). *See, e.g.*, *In re Ukwu*, 926 A.2d at 1113-14 (Rule 8.4(c) may be violated recklessly). In concluding that Krame's deception was merely reckless, the Hearing Committee opined that Krame did not intentionally falsify time records, but instead sloppily pieced through his records without adequate regard for their accuracy. Because it did not believe Krame intentionally falsified the four time entries or that he gave intentional false testimony about his preparation of those entries, the Hearing Committee concluded that Krame did not violate Rule 3.3(a)(1), which requires a knowing mens rea. It also found that Krame did not violate Rule 1.5(a) because Disciplinary Counsel presented no evidence showing that the fees charged in the recklessly submitted time entries were ultimately unreasonable.

The Board disagreed that Krame did not deliberately falsify his time records, concluding that Krame's "justifications [for the alterations were] not credible." Having determined Krame acted intentionally, rather than recklessly, the Board then found that Krame also violated Rule 3.3(a)(1) when he submitted the altered time entries and that his testimony before the Hearing Committee "seeking to justify that conduct was intentionally false." It also found that Krame, by billing the Brown and Baker trusts for impermissible litigation costs in violation of Judge Wolf's order, charged an unreasonable fee in violation of Rule 1.5(a).

Krame concedes that he acted recklessly in violation of Rules 8.4(c) and (d) when he altered the four time entries, but he argues the Board impermissibly ignored the Hearing Committee's credibility findings when it elevated his conduct to intentional and then found additional violations of Rules 3.3(a)(1) and 1.5(a). We agree with him as to Rule 3.3(a)(1) but disagree as to Rule 1.5(a).

*Legal Analysis*

For the reasons explained *supra*, Krame's state of mind is a question of ultimate fact that the Board was permitted to review de novo. But, as we have also explained *supra*, in doing so, the Board was obligated to accept the Hearing Committee's subsidiary credibility findings, especially given that those findings

were based on Krame's demeanor while testifying. *See, e.g.*, *In re Temple*, 629 A.2d at 1208-09. That did not happen here. Rather than accept the Hearing Committee's finding that Krame testified credibly regarding how he prepared the four time entries, and thus did not intentionally falsify his time records, the Board conducted its own de novo review of the record and determined Krame's "justifications [were] not credible." That was not a determination for the Board to make, even if it found Krame's explanation implausible.

Had the Board accepted the Hearing Committee's credibility finding—that Krame did not intentionally falsify his time entries, but instead tried to recreate them based on his experience and records (however misguided that attempted recreation might have been)—it would have had no choice but to accept that Krame's conduct was no more than reckless, rather than intentional. The only way around that would have been for the Board to conclude that the Hearing Committee's credibility finding was not supported by substantial record evidence or was infected by some legal error. The Board made neither of the predicate determinations that would permit it to revisit the Hearing Committee's credibility findings, and Disciplinary Counsel does not urge us to do so on appeal. We therefore conclude that Krame's alteration of his time entries was reckless, but not intentional, in violation of Rules 8.4(c) and

(d). Because we cannot say that Krame knowingly falsified his time entries, we further conclude that he did not violate Rule 3.3(a)(1).

Finally, we turn to the alleged violation of Rule 1.5(a), which prohibits charging an unreasonable fee. The Hearing Committee declined to find a violation, stating that it had "no District of Columbia authority for [the] proposition" that "recklessly dishonest" time entries are "unreasonable per se." Yet, in *In re Cleaver-Bascombe*, we said "[i]t cannot be reasonable to demand payment for work that an attorney has not in fact done," with no reference to any requirement that this demand be intentionally false. 892 A.2d 396, 403 (D.C. 2006). Relying on *In re Cleaver-Bascombe*, the Board found that Krame had violated Rule 1.5(a) based on the fact that he had "submitted two fee petitions that included false and dishonest entries . . . that the Hearing Committee found to be 'baselessly inflat[ed].'" Whether Krame's recklessly dishonest time entries were unreasonable is a question of law that the Board was entitled to review de novo. In concluding that they were, the Board credited the Hearing Committee's finding that the entries were "baselessly inflat[ed]" and did not rely on its own opinion that the inflation was intentional. We agree with the Board that to demand payment for work not done, even if the demand is merely reckless and not intentional, is to demand an unreasonable fee, and so Krame violated Rule 1.5(a).

## E.  Supplemented time entries

*Factual Background*

Disciplinary Counsel also discovered during its investigation that after Krame lost his appeal in *In re D.M.B.*, he added new charges and services to his time entries within PCLaw before submitting his outstanding fee requests for the Brown and Baker trusts.  As described by Disciplinary Counsel, "[t]hese additional time charges were for services [Krame] claimed to have completed six months to three years earlier—over 50 additional time charges in *Brown* and over 40 additional time charges in *Baker*."  The additional time charges increased the fees claimed for the Brown trust by $10,800, which roughly approximated the $10,317.47 in fees Judge Wolf disallowed in Krame's various fees requests relating to the Brown trust ($1,417.17 in the second fee petition, $8,700 in the third fee petition, and the order to return a $200 litigation-related expense).  They also increased the charged fees for the Baker trust by $8,775, which brought his total request to "about 1% of the original [trust] corpus . . . when annualized"—1% being the compensation fee Krame had requested and been denied in *In re D.M.B.*  Believing the additional charges were a way for Krame to collect his desired 1% fee as well as his litigation

costs related to that desired fee, Disciplinary Counsel charged Krame with violating Rules 3.3(a)(1) and 8.4(c).[10]

While both the Hearing Committee and the Board expressed concern over Krame's ability to accurately and reliably recall services he performed months and years after the fact, they concluded that Disciplinary Counsel did not carry its clear and convincing burden on these charges. Disciplinary Counsel takes exception to this finding, arguing that the Hearing Committee and the Board "ignore[d] common sense and personal experience" when determining there was no evidence to support Disciplinary Counsel's charges. We agree, to an extent.

*Legal Analysis*

We agree with Disciplinary Counsel that clear and convincing evidence exists to conclude that Krame supplemented his time entries recklessly and in violation of Rule 8.4(c), and that the Hearing Committee and Board's contrary conclusion is not

---

[10] It is not entirely clear if Disciplinary Counsel charged this conduct as also violating Rules 8.4(d) (conduct that is prejudicial to the administration of justice) and 1.5(a) (charging an unreasonable fee). But neither the Hearing Committee nor the Board considered such an argument, and Disciplinary Counsel does not appear to assert these violations on appeal, contending only that Krame "dishonestly padded both fee petitions." We therefore do not consider whether Krame violated Rules 8.4(d) or 1.5(a) on account of these supplemental time entries.

supported by substantial evidence. The Board and the Hearing Committee were too wary of applying their common sense in a way that cannot be reconciled with our (and their) earlier conclusions that Krame's altered time entries were at least reckless. As we made clear in *In re Godette*, the Hearing Committee and the Board are "not precluded from using their common sense in evaluating the record." 919 A.2d 1157, 1165-66 (D.C. 2007). And here, commonsense is paramount.

Both the Board and Hearing Committee acknowledged that "delayed recordation inevitably diminishes the accuracy and credibility of time entries." While parties might reasonably debate the reliability of time entries submitted at the conclusion of a month's worth of work, there can be little debate regarding the diminished reliability of entries first recorded several months or years after the work was completed. That reality, in tandem with (i) the lack of detailed record evidence substantiating Krame's work on the Brown and Baker trusts during the appeals period, (ii) the "implausibility" of several of Krame's explanations for how he was able to remember certain services he conducted years earlier noted by the Hearing Committee, and (iii) the fact that the additional charges to the Baker trust gave Krame his desired 1% fee, and that the additional charges to the Brown trust offset the various fees disallowed by Judge Wolf, clearly establishes that Krame's supplemented time entries were recklessly submitted in violation of Rules 8.4(c).

We cannot say that those time entries were intentionally falsified so as to constitute violations of Rule 3.3(a)(1), however. For the reasons explained *supra* regarding the Hearing Committee's crediting Krame's explanation of how he prepared the supplemented time entries for the Brown and Baker fee petitions, we would have to reject the Hearing Committee's credibility findings to find a violation of 3.3(a)(1), and we have no basis for doing so. We thus agree with the Hearing Committee and the Board that Krame did not violate Rule 3.3(a)(1) in submitting these supplemented time entries.

\*             \*             \*

In sum, with respect to Krame's oversight of the Brown and Baker trusts, we conclude that Krame violated Rules 3.3(a)(1) and 8.4(c) when he intentionally misled Judge Wolf into believing he did not have useful time records pertaining to the first fee petition filed in relation to the Brown trust; Rules 3.3(a)(1) and 8.4(c) when he intentionally did the same to Judge Wertheim pertaining to the second fee petition filed in relation to the Baker trust; Rule 3.4(c) when he defied Judge Wolf's orders by expensing litigation costs to the Brown trust and failing to promptly repay certain of those costs; and Rules 1.5(a) and 8.4(c) and (d) when he recklessly submitted altered time entries.

## IV.

We turn now to the negligent misappropriation charges, which stem from two duplicate disbursements Krame made to himself from the Seay trust.

*Factual Background*

The first duplicate payment occurred on January 2, 2002, when Krame disbursed $7,178.80 to himself from the Seay trust after the probate court approved his fourth fee petition. That payment was duplicative of services Krame had already paid himself a year earlier on February 21, 2001 when he first submitted the fourth fee petition. Krame testified that the duplicate payment occurred as a result of the "passage of time between February 12, 2001 [the date he submitted the fourth fee petition and made the first disbursement] and January 2, 2002 [the day the probate court approved the fourth fee petition and he made the duplicate disbursement]," "personal and administrative difficulties" at his firm, as well as his reliance on instructions from his administrative staff for when disbursements were appropriate. The Hearing Committee credited this testimony.

The second duplicate payment occurred on September 18, 2002, when Krame disbursed $6,770.38 to himself from the Seay trust after the probate court approved

a portion of his fifth fee petition. That payment was duplicative because Krame had already disbursed the approved amount to himself on February 5, 2002, the day he submitted the fifth fee petition. Krame again testified that the error occurred given the passage of time between the submission of the fee petition and the court's approval order, his "continued press of heavy work," as well as instruction by his administrative staff to disburse the funds. The Hearing Committee credited this testimony as well.

On February 24, 2003, Krame discovered the second duplicate payment while preparing the sixth accounting for the Seay trust, and two days later he reimbursed the trust for the errant double-billing and notified the probate auditor of the error. The first duplicate payment, however, was not discovered until seven years later, on November 30, 2010, when Krame was reviewing his records in response to Disciplinary Counsel's investigation. Krame testified that discovery of the first duplicate payment was delayed "because [the payment] fell into separate accounting periods, so it wasn't readily apparent in preparing accountings that there had been a double payment."

A majority of the Hearing Committee found that the duplicate payments did not amount to negligent misappropriation. It emphasized that the erroneous

disbursements were the result of innocent mistakes "made not by [Krame] but by his employees," and that Disciplinary Counsel had presented no argument or evidence to establish that Krame's bookkeeping system or supervision of his staff were inadequate. Under such circumstances, the Hearing Committee reasoned that misappropriation had not been proven.

The Board disagreed for two reasons. First, it found that the erroneous disbursements were not a mistake made only by Krame's staff. It noted that Krame not only "personally signed [the] checks disbursing" the excessive funds, but "reviewed and signed the accountings that listed the improper payments." Had Krame been more diligent in those responsibilities, the Board determined, the duplicate payments would not have occurred. Citing *In re Robinson*, 74 A.3d 688, 695 (D.C. 2013), it also concluded that Krame was negligent for not discovering the first duplicate payment sooner because discovery of the second duplicate payment should have been "a serious wake-up signal" for Krame to review his records for other erroneous payments. Second, the Board reasoned that misappropriation is essentially a nondelegable per se offense, so even if the duplicate payments were an honest mistake made entirely by Krame's staff, Krame would still be at fault. Based on these findings, the Board determined that Krame violated Rule 1.15(a) by misappropriating the Seay trust funds.

*Legal Analysis*

Krame takes exception to the Board's negligent misappropriation findings. He argues the Board was wrong on both the law and the facts. As to the law, he contends that while this court has referred to misappropriation as "essentially a *per se* offense," it is not a strict liability offense; some level of negligent culpability is still required to establish a violation of Rule 1.15(a). Thus, if the erroneous duplicate payments were the product of an innocent, good faith mistake that did not violate a standard of reasonable care, by law, he could not have negligently misappropriated the Seay trust funds. As to the facts, Krame argues his conduct did not fall below a reasonable standard of care because Disciplinary Counsel presented no evidence to indicate that he did not have adequate bookkeeping practices in place, that he did not adequately train or supervise his staff, or that it was negligent for Krame to rely upon his staff to inform him when it was appropriate to disburse funds from the Seay trust.

While we might agree with Krame's legal contention,[11] we need not resolve it because we disagree with his contention that none of his conduct fell below a

---

[11] This court has suggested that misappropriation is "essentially a *per se* offense," but we have never sustained a Rule 1.15(a) charge absent some finding of a culpable mindset at least rising to the level of negligence. *See In re Haar*, 698 A.2d 412, 427, 428 & n.7 (D.C. 1997) (Ruiz, J., dissenting) (collecting cases); *see*

standard of reasonable care. Krame reviewed the single-page sixth accounting for the Seay trust after discovering one duplicate payment, and that accounting showed three legal fees listed as disbursements to himself: one for $7,178.50 disbursed on January 2, 2002; one for $6,835.38 disbursed on February 6, 2002; and one for $6,770.38 disbursed on September 18, 2002.[12] The three disbursements should have been an immediate tip-off that something was amiss. After all, these were *annual* fees—meaning, there generally should have been only one per annual accounting. Krame recognized that oddity with respect to the $6,770.38 disbursed on September 18, 2002, concluding that it was a duplicate payment of the amount disbursed on

---

*also generally* Nancy J. Moore, *Mens Rea Standards in Lawyer Disciplinary Codes*, 23 Geo. J. Legal Ethics 1 (2010) (providing overview of mens rea requirements in disciplinary rules). Nor have we ever held that an attorney can violate Rule 1.15(a) based on a third party's actions absent some negligent contributory conduct by the attorney (e.g., failing to adequately supervise said third party as required under Rule 5.3). *See, e.g.*, *In re Robinson*, 74 A.3d 688, 694 & n.12 (D.C. 2013) (deferring on question whether non-negligent supervision of a third party can amount to a violation of Rule 1.15(a)); *cf. In re Beauregard*, 189 A.3d 1236, 1246-47, 1252 (Del. 2018) (where recordkeeping duties have been delegated to a third party, an attorney cannot violate Rule 1.15(a) unless negligent in training or supervising third party). Those questions remain for another day, however, because we conclude Krame was negligent.

[12] The $65 difference between these latter two duplicative payments was the result of an additional cost that Krame had initially reimbursed himself for in the February disbursement, but later concluded was in error. He reimbursed the trust with the higher amount upon detection of the double payment, i.e., the full amount of the February disbursement, inclusive of the errant $65 in costs.

February 6, 2002. But he did not recognize the same regarding the $7,178.50 disbursement, and his failure to investigate further under these circumstances was at least negligent.

If Krame had merely glanced back at the fifth accounting from the prior year he would have seen what he ultimately did not learn until seven years later: that the $7,178.50 disbursement in January 2002 was also a duplicate of a disbursement he received in February 2001.[13] Having already been put on notice of one duplicate payment in that very same year, a reasonably diligent attorney should have taken the five minutes to review the fifth accounting to make sure he had not made the same error before. That is especially so here where the sixth accounting reflected three "annual" fees, not just two, and where Krame described his law firm at the time of these disbursements as being in "turmoil" and experiencing "administrative difficulties," which further increased the likelihood that more than one duplicate error existed. Particularly when an attorney is aware that their office is in

---

[13] As with the September 2002 duplicate payment, there was a slight discrepancy between the January 2002 duplicate payment and the original amount disbursed, to the tune of $88. We do not attribute any importance to that, because to the extent Krame believed the January 2002 payment was for services rendered in the prior year, a brief review of the prior year's single-page accounting should have immediately notified him that he had already reimbursed himself for those services.

administrative turmoil, they ought to be especially diligent in ensuring that one substantial accounting error is, in fact, just the one.

As the Board correctly recognized, Krame's less-than-diligent response to his review of the sixth accounting is analogous to the negligent misappropriation that occurred in *In re Robinson*. There, respondent entrusted an employee with managing the firm's trust account, which held client funds. 74 A.3d at 691. After five years without incident, the trust account's funds were mistakenly overdrawn when the employee managing the account accidentally placed client funds in the operating account rather than the trust account. *Id.* Respondent's bank notified him of the overdraft, but respondent did not take the appropriate steps to investigate or rectify the issue. *Id.* at 692-93, 695. As a result, the firm's trust account was overdrawn a second time. *Id.* at 693. This court found that respondent's failure to investigate and fix the overdraft issue "in a more diligent fashion," despite being "clearly . . . on notice that something was amiss," caused the second overdraft, which amounted to negligent misappropriation. *Id.* at 695-96. The same is true here. Krame's discovery of the second duplicate payment in the sixth accounting should have been "a serious wake-up signal" that "something was amiss." *Id.* His failure to respond accordingly by investigating his records to determine whether other duplicate payments had been made delayed his discovery of yet another duplicate payment by

seven years. That unreasonably delayed detection turned what could have been a non-culpable mistake into negligent misappropriation.[14]

## V.

We turn now to the appropriate sanction. The Board and Disciplinary Counsel recommend that we disbar Krame. That is a far harsher sanction than either the six- to eighteen-month suspensions recommended by the members of the Hearing Committee or the "brief suspension" of thirty to sixty days that Krame advances as appropriate. Considering the Rule violations detailed above, we conclude that an eighteen-month suspension—the harshest sanction recommended by a member of the Hearing Committee—is the appropriate sanction.

Although "we normally adopt the Board's recommendation as long as it 'falls within the wide range of acceptable outcomes,'" *In re Ekekwe-Kauffman*, 210 A.3d 775, 797 (D.C. 2019) (quoting *In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013)), that

---

[14] The Board and Disciplinary Counsel put forth several other arguments for why the two erroneous payments resulted in negligent misappropriation, including that the disbursements themselves were negligent. We can put those theories aside, because Krame's substantially delayed detection of one duplicate payment suffices to conclude that Krame engaged in negligent misappropriation, and we would not think a stiffer sanction is warranted even if we were to find a second negligent misappropriation. *See In re Robinson*, 74 A.3d at 695 n.14; *id.* at 694 n.12.

deference is not warranted here where we have rejected some of the most serious violations found by the Board. *See id.* (no deference given where we disagreed with the Board's misappropriation finding). The Board erred when it rejected several of the Hearing Committee's credibility findings, causing it to find more intentional and egregious violations of certain Rules. If not for those additional and more severe violations that we do not sustain—each of which involved the intentional submission of fabricated documents—we think it unlikely the Board would have recommended disbarment.

The Board relied heavily on those now-rejected violations as animating its recommendation, citing a host of cases where disbarment was the appropriate sanction for deliberately submitting fraudulent documents. *See In re Cleaver-Bascombe*, 986 A.2d 1191 (D.C. 2010) (attorney disbarred for intentionally submitting a fraudulent voucher and then later lying about it); *In re Goffe*, 641 A.2d 458 (D.C. 1994) (attorney disbarred for manufacturing evidence and lying to both the Tax Court and the Hearing Committee); *In re Howes*, 39 A.3d 1 (D.C. 2012) (attorney disbarred for deliberate and repeated false sworn statements and certifications to the government that resulted in the misuse of public funds). Because we conclude that Krame recklessly, but not intentionally, submitted dishonest time records to the probate court, we do not consider those cases animating the Board's

recommendation especially analogous to Krame's conduct, and thus find disbarment inappropriate.

So we are left to fashion our own sanction, and do so knowing that this "is not an exact science but may depend on the facts and circumstances of each particular proceeding." *In re Goffe*, 641 A.2d at 463. Non-disbarment sanctions this court has imposed for Rule violations involving false or dishonest statements "range from a suspension of thirty days to a suspension of three years," *In re Guberman*, 978 A.2d 200, 207 (D.C. 2009); *see also id.* at 207 n.7 (collecting cases), and a six-month suspension is the usual discipline "meted out in this jurisdiction for negligent misappropriation," *In re Mirsky*, 860 A.2d 363, 365 (D.C. 2004). Given the number of Rule violations committed here, some of which were the product of intentional conduct meant to mislead the probate court and circumvent its orders, we think the brief suspension that Krame urges us to impose is not appropriate and would not serve a strong enough deterrent for future misconduct. *See In re Martin*, 67 A.3d at 1053 (more severe sanction is appropriate "where dishonesty is accompanied by other serious violations or is protracted"). This is particularly so when we consider the vulnerability of the trust beneficiaries Krame was serving as a trustee for.

However, we also acknowledge the following substantial mitigating factors: Krame's otherwise unblemished record; his cooperation with Disciplinary Counsel's investigation; his long history of serving the disabled and elderly communities; the significant time Krame has devoted to the profession, including his service on the steering committee of the Bar's Estates, Trusts, and Probate Section; and the amicus brief that over a dozen of Krame's longstanding clients filed on his behalf, attesting to his valuable services, professionalism, upstanding character, and ethical conduct.

On balance, we conclude that these aggravating and mitigating considerations counsel in favor of an eighteen-month suspension for Krame's violations of Rules 1.5(a), 1.15(a), 3.3(a)(1), 3.4(c), 8.4(c), and 8.4(d).

## VI.

It is therefore ORDERED that Evan J. Krame is suspended from the practice of law in the District of Columbia for eighteen months. For purposes of reinstatement, we refer Krame to the requirements under D.C. Bar R. XI, § 16(c), and further direct his attention to D.C. Bar R. XI, § 14, governing the responsibilities of suspended attorneys.

*So ordered.*